[No. C070782. Third Dist. Apr. 11, 2013.]

In re A.M., a Person Coming Under the Juvenile Court Law.
YOLO COUNTY DEPARTMENT OF EMPLOYMENT AND SOCIAL
SERVICES, Plaintiff and Respondent, v.
M.W., Defendant and Appellant;
PIT RIVER TRIBE, Intervener and Appellant.

[CERTIFIED FOR PARTIAL PUBLICATION*]

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I and II of the Discussion.

**COUNSEL**

Monica Vogelmann, under appointment by the Court of Appeal, for Defendant and Appellant.

Delia Parr for Intervener and Appellant.

Robyn Truitt Drivon, County Counsel, and Jennifer Cretcher-McCoy, Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

**HULL, Acting P. J.**—M.W., mother of the minor (mother), and the Pit River Tribe (Tribe) appeal from orders terminating parental rights after reversal of the previous termination orders and remand in *Yolo County Department of Employment and Social Services v. M.W.* (Feb. 24, 2012, C067143) (nonpub. opn.), for a new hearing on mother's petition for modification. (Welf. & Inst. Code, §§ 366.26, 395; further undesignated statutory references are to the Welfare and Institutions Code.) Mother argues the court erred in denying her petition for modification (§ 388) and failed to apply the Indian child exception to termination of parental rights. The Tribe raises various issues related to tribal customary adoption (TCA) and the Yolo County Department of Employment and Social Services's (Department) inaction with respect to TCA. We affirm the juvenile court's orders.

### FACTS AND PROCEEDINGS

The infant minor was removed from parental custody and adjudged a dependent child in 2008. Mother claimed Indian heritage and the minor was enrolled as a member of the Tribe of Burney, California. Mother failed to reunify after 18 months of services and in May 2010, the court set a selection and implementation hearing to choose a permanent plan for the minor. The Department recommended termination of parental rights and a permanent plan of adoption.

Prior to the selection and implementation hearing, mother filed a petition for modification seeking reinstatement of reunification services. After a hearing on the petition in December 2010, the court denied the request for services believing it lacked authority to order services past the statutory 18-month time limit. (§ 361.5, subd. (a)(3).) At the selection and implementation hearing in January 2011, the court found guardianship was in the minor's best interests based on evidence that termination of parental rights would result in the minor losing his membership in the Tribe if not adopted by a tribal member. The court wanted the Tribe to consider TCA.

Mother appealed the denial of her petition for modification. This court reversed the denial and the order terminating parental rights and remanded the case for a new hearing on the petition for modification.

While the appeal was pending, a review report in July 2011 stated the tribal representative told the social worker the Tribe had taken no action on

TCA, preferring guardianship as a permanent plan for the minor. The caretaker information form detailed the caretakers' efforts to maintain the minor's connection to his Tribe and to Native American cultural practices in general, including finding a mentor from the minor's Tribe who taught the minor songs and drumming. The form also stated that the minor was somewhat resistant to attending visits with mother and slept for several hours following each visit. The caretakers wanted to adopt the minor to provide him emotional stability. At the review hearing, the court again set a selection and implementation hearing and expressed concerns about whether adoption would affect the minor's status as a tribal member.

In August 2011, mother filed a second petition for modification seeking return of the minor with family maintenance services or renewed reunification services with increased visitation. She alleged the modification would be in the minor's best interests because he was bonded to her and his sibling and needed interaction with his specific band of the Tribe. Various documents were attached to the petition to demonstrate mother's ongoing sobriety and progress in relapse prevention. Additional documentation, including letters from the Sacramento Native American Health Center Inc. regarding mother's relapse prevention efforts, her home visitations to improve parenting and her participation in cultural events, was subsequently provided.

The report for the selection and implementation hearing concluded the minor was adoptable and recommended termination of parental rights with adoption by the current caretakers. Mother regularly attended supervised visitation and visits were generally appropriate.

An assessment from California's State Department of Social Services (CDSS) stated that the minor was placed in a Native-American-certified foster home under legal guardianship. The guardians wished to adopt the minor. The minor was described as a healthy, happy, loving and social child who was well bonded to his guardians. The guardians each had formal education in Native American studies. They were committed to supporting his cultural connection to his Tribe, had taken him to Native American events for the past three years and had a mentor for the minor from his own Tribe. CDSS strongly recommended adoption as the permanent plan for the minor.

The ICWA (Indian Child Welfare Act of 1978; 25 U.S.C. § 1901 et seq.) expert, Sean Osborn, submitted a declaration stating that he had reviewed a letter from the tribal chairperson which stated that if the minor were adopted he would not lose his status as a member of the Tribe. Osborn described the

minor's placement and attachment to his caretakers. He noted TCA had been proposed at one point by the tribal representative but no action to bring the permanent plan to fruition had occurred and it was no longer a viable alternative. Based upon his review of the reports and statements from the social worker, Osborn concluded that the minor would be at risk of serious emotional or physical damage if returned to mother's care, in part due to the potential for relapse if mother had the additional stress of caring for the minor as well as the sibling she currently had in her care. He stated that it was in the minor's best interests to be adopted by his current caretakers and it would be emotionally traumatic for him to be removed from their care.

An updated caretaker information form stated that recent visits between the minor and mother had gone well, although the minor was somewhat withdrawn prior to visits and always fell into a deep sleep following visits. The caretakers continued to be committed to development of the minor's Native American heritage both generally and as a member of the Tribe. Although some attempt had been made to contact the representative of the minor's specific band within the Tribe, there appeared to be some tension which led to the caretakers feeling unwelcome to bring the minor to visit the reservation. However, they intended to take the minor when he was older and better able to participate in events.

A psychological report by Dr. Siggins in February 2012 assessed the quality of the bond between the minor and his caretakers. In addition to reviewing records in the case, the psychologist also observed the caretakers and the minor interact in their home. He opined that the minor was in the third state of bonding with the caretakers and creating the foundation for his own moral development. He concluded that any significant disturbance in the bond was not in the minor's best interest and would likely result in a detriment to the minor's sound psychological and social development.

The Tribe requested an assessment by a clinical psychologist, Dr. Martinez, who addressed the specific question of whether the minor would be harmed by a return to mother's care. Dr. Martinez found no evidence of serious harm to the minor if returned to mother and no indication that continued custody by her would likely result in serious emotional or physical harm to the child. He recommended a renewal of reunification services with an increase in visits and less supervision.

The hearing on the petition for modification began in March 2012. Dr. Martinez testified in accordance with his report. He said mother should be offered additional services and that currently there were no conditions endemic to mother or her home which would provide a risk of serious harm to the minor. He did not evaluate what would be in the best interests of the

minor because he was only asked to address the recommendations for a permanent plan for the minor. Accordingly, he did not evaluate either the minor or the minor's interaction with mother and had no opinion on whether it was in the minor's best interest to return to mother. Because of the limitations on Dr. Martinez's report, the court did not accept his report as evidence on the petition for modification.

Mother testified about her current circumstances, including her ongoing therapy, bible studies, participation in 12-step and recovery groups, home health parenting and Native American activities. Mother also testified about her current stability and ongoing care of the minor's sibling who was placed with her. She believed that it was in the minor's best interests to be with family because he belonged with her and she had changed. Mother felt that they deserved a chance to be together and was concerned he was not participating in tribal activities. She acknowledged that she had not participated in Pit River tribal activities in two years but had attended more general Native American activities.

Dr. Siggins also testified in accordance with his report. After observing the minor in the caretaker's home, he concluded the minor was securely attached to the caretakers, the bonds were strong and removal and returning the minor to mother would be devastating to the minor and result in serious emotional harm to him. In his opinion, there would be both an immediate and a future impact on the minor if removed from the current caretakers. Observing visits would not change his opinion as he assumed the minor's reaction to mother in visits would be positive due to his secure attachment to his caretakers.

The social worker testified mother had monthly visits. Visits were generally good and the minor was happy to see his mother and sibling but was usually ready for the visits to end. The social worker was informed that the minor's visits with the state adoptions worker were similar to those with mother and the minor was also happy to see the adoptions worker. The social worker had reports that the minor was subdued before visits and, after visits with mother, was very tired and slept in the car on the way home, sometimes waking up screaming. In the social worker's opinion, it was in the minor's best interests to remain with the current caretakers rather than have further reunification efforts with mother.

One of the caretakers testified, describing the minor's behavior before visits as subdued and stating that after visits the minor would sleep up to four hours. She further testified that Native American heritage was a great part of the caretakers' lives because of their professions as academics in Native American studies and having lived on the Navajo reservation. They attended numerous local and regional events. They traveled widely to other indigenous

communities and the minor went with them. They worked with people about attending intertribal events and had strong relationships with a nearby Wintun tribe. The minor had attended several events in the Feather River and Colusa area. One of their friends was a member of the Tribe, although in a different band from the minor, and has acted as a mentor for the minor, involving him in songs and drumming. The caretakers had not felt welcome to take the minor to the tribal area but hoped that when the minor's status was resolved they would be able to take him there for events. She believed that the minor's best interests would be best served by remaining in their home and that removal would have a detrimental impact on him.

After reviewing the exhibits and hearing argument, the court found mother's circumstances had changed since December 2010 in that she had made significant progress in resolving her various issues. Recognizing the significance of the minor's Indian heritage, the court also considered that the minor had been in the current placement since October 2008 and the testimony regarding best interest of the minor presented by Dr. Siggins, the social worker and the minor's caretaker and concluded that it was not in the minor's best interest to grant the petition for modification.

The court moved on to the selection and implementation hearing. The Indian expert testified the minor's current placement was appropriate under ICWA. The expert also testified that the minor would be at risk of serious emotional and physical harm if returned to parental custody because the father did not complete services and, while mother now had the sibling placed with her, given mother's earlier difficulties, placement of a second child would increase the stress on mother and place the minor at risk of harm. In his experience, adding another child to the home of an at-risk parent who has stabilized leads to failure of the placement. Moreover, it would be traumatic to the minor to lose his relationship with the current caretakers. The expert's opinion was unaffected by mother's recent stability and positive visits. Because adoption would not sever the minor's connection to the Tribe, the expert believed adoption was the most appropriate plan for the minor even though the Tribe did not want mother's parental rights terminated. The expert testified that, at this stage of the minor's development, taking the minor to some Native American events and exposing him to cultural practices and celebrations would be an appropriate level of connection to the Tribe. His current caretakers also would provide him with multiple perspectives on other tribal ways which would ultimately benefit him.

Mr. Ward, the council person for the Madesi band of the Tribe and a cousin of mother's, testified that the Tribe preferred not to have its members adopted and that TCA was a better alternative than traditional adoption. He was aware that the Tribe was given an opportunity to work on TCA when the guardianship was granted. Contrary to the Tribe's letter, Ward believed that, if

adopted, the minor would no longer be a part of the Tribe. The Tribe's preference was for the minor to be returned to mother. Ward stated that he had invited the caretakers to come to the tribal lands and he would show them around. He denied discouraging them from coming.

In its ruling, the court commented that it had initially ordered a plan of guardianship to allow for a TCA, which did not occur. The court found the minor was adoptable. The court further found the benefit exception was not established because, despite regular visitation for the last 18 months, the minor would not benefit from continued contact with mother based on evidence that he continued to be impacted by visits, as evidenced by his demeanor before visits and sleeping for hours after. The court considered the Indian child exception, finding that termination of parental rights would not interfere with his membership rights. The court noted that, while mother valued her Indian heritage, she had not attended tribal events, only more general Native American events, not unlike those the caretakers had attended with the minor. Moreover, the minor had a mentor from his Tribe, albeit a different band within the Tribe, and this constituted an effort to keep the minor in touch with his heritage. The court accepted the testimony that the caretakers were welcome to visit tribal lands, thus, there would not be a substantial interference with his connection with either the Tribe or his particular band. The court recognized that the Tribe had identified guardianship as the preferred permanent plan, but that plan was appropriate only as a transition to TCA which never occurred. The court found active efforts to take into account the minor's social and cultural values and way of life in the minor's Tribe and, based on Dr. Siggins's testimony and report that returning the minor to mother's custody would result in serious emotional or physical damage to the minor, adopted modified findings and orders terminating parental rights and selecting adoption as the permanent plan.

DISCUSSION

I–II*

. . .`. . . . . . . . . . . . . . . . . . . . `. . . . . . . . . . . . . . . . .

III

*Tribal Customary Adoption*

The Tribe raises several issues relating to the TCA process. We shall briefly describe the process as it is set forth in the relevant statutes.

---

*See footnote, *ante*, page 339.

■ TCA is an alternative to a standard adoption and protects both the Tribe's and the child's interests in maintaining tribal membership by formalizing an adoption by an individual selected by the Tribe without terminating parental rights. Section 366.24 sets forth the procedures to institute a TCA. First, the assessment report for the selection and implementation hearing must address the TCA option. (§§ 366.21, subd. (i)(1)(H), 366.24, subd. (b).) If the Tribe decides that TCA is the appropriate alternative, the Tribe or its designee conducts a home study prior to approval of the TCA placement, including a check of the Child Abuse Central Index and state and federal criminal background checks. (§ 366.24, subd. (c)(1), (2), & (3).) ■ This assessment and the TCA order from the Tribe should be completed prior to the selection and implementation hearing and the TCA order should be filed with the court prior to the selection and implementation hearing. (§§ 366.21, subd. (i)(1)(H), 366.24, subd. (c)(6).) However, if it is not and the Tribe has identified TCA as the desired permanent placement plan, the juvenile court may continue the selection and implementation hearing for up to 120 days to permit the Tribe to complete the process for TCA and file the TCA order with the juvenile court. (§ 366.24, subd. (c)(6).) The juvenile court has discretion to continue the hearing for an additional 60 days to complete the TCA process. (§ 366.24, subd. (c)(6).) At the selection and implementation hearing the parties may present evidence to the Tribe on the TCA and the minor's best interest. (§ 366.24, subd. (c)(7).) Once the juvenile court affords full faith and credit to the TCA order the child is eligible for TCA placement. (§ 366.24, subd. (c)(8).) After the order has been afforded full faith and credit, the TCA parents file an adoption petition. (§ 366.24, subd. (c)(12).) Following required reports to the court, a period of supervision and a final decree of adoption, the TCA parents have the same rights as any other adoptive parent and the court terminates jurisdiction over the child. (§ 366.24, subd. (c)(12), (13) & (14).)

■ We note that the selection and implementation hearing is generally set within 120 days from an order terminating services. (§ 366.21, subds. (e), (g)(4).) That statutory time period may have led to some of the parties and witnesses confusing it with the provision in section 366.24 permitting the court to continue the selection and implementation hearing for 120 days to complete the assessment and TCA orders. Section 366.24 makes it clear the two time periods are separate.

(a) *Availability of TCA at the Second Selection and Implementation Hearing*

The Tribe argues that, because the juvenile court never ordered a 120-day continuance to complete the TCA process, TCA was still available at the second selection and implementation hearing.

■ We agree that the TCA option for permanent placement remained open at the second selection and implementation hearing, but that condition obtained, not because the court did not order a continuance, but rather because the court initially ordered a permanent plan of guardianship to give the Tribe an opportunity to explore TCA as an option and to present it to the court as an alternative to guardianship. The 120-day continuance provision of section 366.24 is not a time limit in which the TCA must be initiated and completed, but rather an opportunity to permit additional time for a tribe that has designated TCA as an alternative permanent plan and has begun, but not completed, the assessments and TCA order necessary to present to the court for a full faith and credit determination.

In this case, the Tribe never designated TCA as an alternative permanent plan prior to the first selection and implementation hearing, preferring a plan of guardianship or return of the minor to the mother. The juvenile court ordered guardianship with the understanding that the Tribe would investigate the TCA option and the matter could be heard again at a new selection and implementation hearing if it did so. No one objected to this procedure at the time and the Tribe took no action on the TCA.

■ When the second selection and implementation hearing was scheduled, everyone was aware of the TCA option, but the Tribe continued to express a preference for guardianship or return to mother. Because the TCA option was not being pursued and the Tribe did not request a continuance to complete a TCA, the juvenile court was not required to continue the selection and implementation hearing and could proceed to select a different permanent plan as supported by the evidence. (§ 366.24, subd. (c)(6).) The statute does not give the Tribe an unlimited amount of time to decide whether to pursue a TCA. There was no error in the procedures employed at the second selection and implementation hearing.

(b) *Standard Adoption and the Minor's Connection to the Tribe*

The Tribe challenges the juvenile court's order terminating parental rights arguing that a standard adoption cannot ensure that the minor will have a connection to the Tribe.

The only permanent plan which could *ensure* a continuing connection to the Tribe is TCA because there is no requirement that an individual who is a guardian or who adopts an Indian child maintain such a connection. The TCA plan was not chosen by the Tribe, which made its preference for guardianship or return to mother clear. Because there was no tribal order for TCA before it, the juvenile court had no choice but to consider the traditional alternatives for

permanent plans. (§ 366.24, subd. (c)(6).) As we have said, the preferred plan is adoption. (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368 [52 Cal.Rptr.2d 474].)

At the selection and implementation hearing, there was testimony from one of the caretakers about their ongoing efforts to maintain the minor's connection to his Native American heritage in general and to his Pit River heritage in particular. According to the evidence, the level of the minor's ongoing instruction and participation in Native American and Pit River heritage was at least as much as mother's if not more so. There was conflicting evidence on whether the caretakers were welcome on tribal lands and the court resolved the conflict by finding that the caretakers were welcome and thus there would be no substantial interference with the minor's connection to the Tribe. The evidence before the court was sufficient to show that the minor would have a connection to the Tribe insofar as possible. Thus, while the permanent plan of adoption was traditional, there was every indication that the caretakers, because of their own interests in indigenous peoples and because of their concern that the minor maintain his ties with the Tribe, would continue to foster such ties. Given the permanent plan selected, the court could do no more.

The Tribe relies on *In re H.R.* (2012) 208 Cal.App.4th 751 [145 Cal.Rptr.3d 782] to suggest that this court should reverse the order terminating parental rights. However the case is distinguishable since in *H.R.*, the Yurok Tribe submitted a TCA order to the court. Here the court did not have such an order and could not weigh whether TCA would or would not be detrimental to the minor.

### (c) *Department Failed to Consult with the Tribe on TCA*

The Tribe now argues that TCA was not addressed in any of the assessments for the selection and implementation hearing.

Both in its brief and at argument, the Tribe blames the failure to achieve a TCA on the Department and the court and the fact that the law was new and the procedures were not well understood. As we have explained above, the initial decision whether to pursue TCA must come from the tribe. That decision does not require an understanding or even the existence of specific procedures. Under the law, the Department is required to discuss the TCA alternative permanent plan in the assessment it prepares for the selection and implementation hearing and, while it did not do so here, the Tribe was well aware that the alternative existed at the time of the first selection and implementation hearing. The court has no duty to make any orders relating to TCA unless a tribe requests a 120-day continuance to complete the home

study and TCA or unless it is presented with a TCA order from the tribe and must afford it full faith and credit.

■ When the juvenile court orders an assessment for a selection and implementation hearing in the case of an Indian child, "the assessment shall address the option of tribal customary adoption." (§ 366.24, subd. (b).)

The Tribe does not point to any part of the record which shows that it objected to this deficiency in the assessments. The challenge to the Department's and CDSS's failure to include the TCA option in the selection and implementation assessment has, therefore, been forfeited. (*In re Christopher B.* (1996) 43 Cal.App.4th 551, 558 [51 Cal.Rptr.2d 43]; *In re Dakota S.* (2000) 85 Cal.App.4th 494, 501–502 [102 Cal.Rptr.2d 196].)

In any case, it is clear from the time of the first selection and implementation hearing that the TCA option was being discussed by the parties and the court. The review report in July 2011 addresses ongoing conversations between the tribal representative and the Department. Nonetheless, in December 2011, the tribal chairperson's letter again emphasized the Tribe's position that returning the minor to mother was the desired outcome of the proceedings. At that time the Tribe still favored guardianship and was taking no action on TCA. In March 2012, the Tribe's expert stated in his report that the Tribe did not support TCA or traditional adoption. Nothing in the record suggests that the Department and CDSS had not discussed TCA with the Tribe or did not stand ready to assist the Tribe in initiating and perfecting such a plan. Any error in failing to include TCA in the assessment is harmless.

(d)  *The Tribe Preferred TCA*

Acknowledging that the Tribe never designated TCA, the Tribe argues that it indicated TCA would be more acceptable than a traditional adoption.

The tribal representative and the council person for the Madesi band of the Pit River Tribe both testified that TCA would be preferable to traditional adoption. However, the Tribe did nothing to further this preference once it became clear that a traditional adoption was the proposed permanent plan. Absent action by the Tribe, the court could do nothing other than select a different permanent plan which best met the minor's need for permanence and stability.

## Disposition

The orders of the juvenile court are affirmed.

Murray, J., and Duarte, J., concurred.

The petition of appellant M.W. for review by the Supreme Court was denied July 24, 2013, S210917. Werdegar, J., did not participate therein.