Filed 3/14/14  In re T.L. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re T.L., a Person Coming Under the Juvenile Court Law. | H040218 (Santa Cruz County Super. Ct. No. DP002157) |
| SANTA CRUZ COUNTY HUMAN SERVICES DEPARTMENT, Plaintiff and Respondent, v. J.L., Defendant and Appellant. | |

## I.    INTRODUCTION

In this juvenile dependency matter regarding T.L. (the child), the juvenile court terminated parental rights and selected adoption as the permanent plan pursuant to Welfare and Institutions Code section 366.26.[1]

On appeal, the father contends that the juvenile court erred in terminating his parental rights because the child is an Indian child (see 25 U.S.C. § 1903(4); § 224.1, subd. (a)), and the Santa Cruz County Human Services Department (the Department) and

_____

[1] All further statutory references are to the Welfare and Institutions Code.

court failed to follow required statutory procedures regarding tribal customary adoptions. The father also contends that the juvenile court erred by finding that termination of parental rights would not substantially interfere with the child's connection to the tribal community. The child joins in the Department's arguments on appeal. For the reasons stated below, we will affirm the juvenile court's orders.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A.    *Section 300 Petition*

On March 2, 2012, the Department filed a petition under section 300, subdivisions (b) [failure to protect] and (g) [no provision for support] alleging that the child, age two, came within the jurisdiction of the juvenile court. A petition was also filed as to the child's half-sibling, who had a different father.

The petition alleged that the child had suffered or was at a substantial risk of suffering serious physical harm or illness due to the mother's violent conduct, substance abuse, and failure to adequately supervise and protect him. The petition described an incident on February 29, 2012, in which the mother had been arrested for offenses including possession of dangerous weapons and resisting a public officer. The mother had been very intoxicated at the time of her arrest. She had left the two children inside the home while engaging in a fight outside. Both children were dirty, and the child was "lying on the living room floor asleep amongst cereal." The mother had previous arrests for violent conduct. Both children were special needs children, and neither child was meeting developmental milestones. Both children had previously been declared dependents of the court.

The petition further alleged that the child had suffered or was at a substantial risk of suffering serious physical harm or illness due to the father's substance abuse and violent behavior. The father had been arrested "at least ten times for drug/alcohol related criminal activity." He had also been arrested "at least ten times for violent criminal conduct."

2

Regarding the allegation that the child had been left without any provision for support, the petition alleged that the mother was incarcerated on pending felony and misdemeanor charges and that the father was serving an 84-month prison term for felony assault.

## B. Detention Hearing

At the detention hearing held on March 5, 2012, the juvenile court found a prima facie showing that the child came within section 300 and that continuing the child in the home of the parent was contrary to the child's welfare. The minute order from the detention hearing states that the child had previously been found to be an Indian child and that the Cheyenne and Arapaho Tribes of Oklahoma (the Tribe) was to be given notice of all further hearings as well as copies of all orders and reports.

## C. Jurisdiction/Disposition Report

The Department filed a jurisdiction/disposition report on April 12, 2012. The Department recommended that the mother be provided with reunification services, but that no services be provided to the father pursuant to section 361.5, subdivisions (b)(12) [conviction of a violent felony] and (e)(1) [parent incarcerated and services would be detrimental to the child].

The Department noted that the Indian Child Welfare Act (ICWA) applied to the child, but not to his half-sibling. During the previous dependency proceedings, the Tribe had confirmed the child was eligible for enrollment, since the father was an enrolled member. The Tribe had also recently confirmed the child's eligibility for membership.

On April 12, 2012, the mother submitted on the Department's report. As to the father, the hearing was continued because he had not been transported from state prison. On May 10, 2012, the social worker requested another continuance in order to get an update on the Tribe's position.

### D.  ICWA Report

On May 29, 2012, the Department filed a report containing a declaration from an ICWA expert.  The expert explained that under ICWA, the first placement preference is with a member of the child's family.  The second placement preference is with a member of the child's tribe.  The third placement preference is in a "general Native American home."  The fourth placement preference is a general foster home, which is where the child had been placed.  The expert agreed that the child would be at risk of serious emotional or physical damage if he was returned to the parents at that time.

In its report, the Department indicated that the social worker had been having difficulty getting information from the Tribe.  The social worker had made numerous attempts to contact a tribal representative in order to determine the Tribe's placement preference in this case, but she had not received a response from the Tribe.

### E.  Jurisdiction/Disposition Hearing

On June 7, 2012, the father submitted the matter on the Department's report.  The juvenile court sustained the petition and adopted the Department's recommendations.  Specifically, the court continued the child in his out-of-home placement, ordered reunification services as to the mother, and denied reunification services as to the father.  The minute order for the June 7, 2012 hearing indicates that the court had received a letter from the Tribe stating the Tribe's position, although the letter is not in the record.

### F.  Department Update

On July 12, 2012, the Department filed an "Update for the Court."  The child was in a foster home along with his half-sibling.  Due to their developmental delays, the children "[did] not play together or interact on any level."  The paternal aunt had concerns about her ability to take the children, due to their developmental delays.  She was willing to take the child, but not his half-sibling.  The Tribe believed it was in the child's best interests to be separated from his half-sibling and placed with the paternal aunt.  The Department agreed that the children should be separated.

4

### G.	*Six Month Review Report and Hearing*

The Department filed its Six Month Review Report on October 23, 2012, in which it recommended the mother continue to receive reunification services. The mother's criminal charges had been dropped. She was working and looking for housing. The children remained in a foster home together and were receiving occupational and physical therapy. They now had a strong bond.

The paternal aunt had been found unsuitable for placement. She did not have adequate space for the child in her home. She worked full time and "would not be able to accommodate the level of care" that the child required for his special needs. Her husband had a criminal history and "would not agree to Livescan."

At the six month review hearing, the juvenile court adopted the Department's recommendations, continuing reunification services for the mother but not the father.

### H.	*Twelve Month Review Report and Settlement Conference*

The Department filed its twelve month review report on April 9, 2013. The Department recommended the juvenile court terminate reunification services to the mother and set a hearing pursuant to section 366.26.

The Department reported it had made repeated attempts to contact the Tribe regarding the child's placement. On March 12, 2013, the tribal representative had indicated that the Tribe believed it was in the child's best interest to remain in his current placement. A social worker had left the tribal representative a voicemail message later that day, explaining that the child's caregiver did not want to adopt the child. The Department had not heard back from the Tribe.

The child was receiving medical care and services for his developmental delays. He needed surgery to correct a testicle that had not descended and to remove an inguinal hernia. He had an eating disorder, oral sensitivity, and was non-ambulatory. He used a standing machine, orthotic braces, and had been fitted for a wheelchair. Although he was three and a half years old, he was physically the size of a one-year-old child and had the

mental capacity of a child aged 10 to 12 months. He was nonverbal, could not feed himself, and was not toilet trained.

The Department had identified a potential adoptive placement for the child. Although he would be separated from his half-sibling, the caregiver had expressed a commitment to maintaining the sibling relationship through visitation. Separating the children would enable their respective caregivers to provide them with individualized attention. The Department was waiting for the Tribe to approve the concurrent placement.

On April 30, 2013, the mother submitted on the Department's report. The minute order for the hearing indicates that a tribal representative appeared telephonically. The tribal representative stated that the Tribe was in agreement with the Department's recommendations. The juvenile court adopted the Department's recommendations, terminating reunification services as to the mother and setting the matter for a permanency planning hearing pursuant to section 366.26.

*I.        Section 366.26 Report and Hearing*

The Department filed its section 366.26 report on August 27, 2013. The Department had informed the Tribe that it was recommending termination of parental rights. The Tribe had not yet provided the Department with any feedback.

The mother had recently been arrested and was facing a possible sentence of 25 years to life. The child had been in a concurrent placement since May of 2013. The caregivers were committed to caring for the child and adopting him. They had remodeled their home to accommodate his special needs.

The permanency planning hearing was held on October 4, 2013. Yolanda Woods, a representative of the Tribe and an Indian expert, appeared telephonically. Woods had worked for the Tribe for eight years. She had previously testified as an expert witness for the Tribe about 70 times. About 65 of those cases had involved the issue of termination of parental rights.

Woods testified that she had met with a group of tribal members and case workers concerning the child's case. The group had "agreed upon termination." The Tribe was aware that the prospective adoptive parents were not Native American, and the Tribe had considered whether termination of parental rights would interfere with the child's connection to his tribal community and membership rights. The Tribe was also aware that the child's half-sibling had been placed with a relative of the child's prospective adoptive parents. The Tribe believed that keeping siblings together was important and in the child's best interests.

The father's attorney asked Woods whether the Tribe had considered "the possibility of adoption without termination of parental rights" so that the child could "maintain his tribal connection, develop his tribal connection and learn about his Indian heritage." Woods replied, "Yes." She explained that there was no guarantee the child would have those cultural needs met even if parental rights were not terminated.

The father's attorney then asked Woods if she was saying that the Tribe had "not even visit[ed]" the possibility of adoption without termination of parental rights. Woods replied, "No. No. When we're addressing termination, we're addressing termination. We understand that there's a cultural connection that could be severed. But there's also times when it could not be severed."

The father's attorney asked again whether the Tribe had even considered "whether or not an appropriate alternative for [the child] would be for him to be adopted and that termination of parental rights not happen." Woods responded, "No. We understand Father's incarcerated. We understand that they are not working their treatment plans. We understand that this child is in a permanent placement now. We understand that."

The father's attorney asked Woods whether she also understood "that an exception to termination of parental rights in an Indian case is that the child may be adopted and that parental rights are not terminated." Woods responded, "No. But I'm answering that

7

question as of now." She further stated, "I'm fine with termination. Our staff is fine with termination."

The father's attorney asked whether Woods agreed that it would be more difficult for the child to "develop and maintain a connection with his tribal community" if parental rights were terminated. Wood responded, "Well, I can put that back and say what have the parents done to keep . . . this child culturally with his community? What's the difference?" Woods acknowledged that the father had recently written letters to the Tribe, expressing the desire to develop and maintain the child's cultural heritage. However, she noted, "[H]is maintaining started after termination was already on the table."

The juvenile court asked whether Woods wanted to add any further information. Woods stated, "We always want our children to be culturally connected. We always do and we don't want to sever that tie. We're not done here after termination. We still have to go in front of an adoption committee and ask their approval for any adoption to occur. Once that occurs, then we go through the cultural aspect of how is this child . . . going to stay culturally connected to their community, their tribe."

The court asked, "So at this point you had looked at whether or not the parents had taken on any role in maintaining a connection, and then after termination of parental rights process, . . . there's a second assessment now that the parents aren't involved how that cultural connection can be maintained?" Woods confirmed, "Yes."

Both parents objected to termination of parental rights. The father represented that he wanted the child to be able to maintain a relationship with him and with the Tribe. The father argued that when the Tribe agreed to termination of parental rights, the Tribe had not understood that the court had "the option of adoption without termination of parental rights."

The Department argued that it was up to the Tribe to request a tribal customary adoption: "If the Tribe says that they object to termination of parental rights and would

8

prefer a tribal customary adoption instead, that's something the Court must consider. But that's not been brought before this Court by the Tribe."

The juvenile court found that the Tribe was not "totally unaware about tribal customary adoptions."[2] The court noted that several different tribal representatives had been involved in the child's case "from the beginning." The court commended the Department and the child's caregivers for all the efforts they had made to obtain appropriate services for the child's "extreme needs." The court found that the child was adoptable and that there was no compelling reason to find that termination of parental rights would be detrimental. The court specifically found that neither the beneficial parent relationship exception nor the sibling exception applied. (See § 366.26, subds. (c)(1)(B)(i) & (c)(1)(B)(v).)

Concerning the father's argument that the child's connection with the tribal community would be severed (see § 366.26, subd. (c)(1)(B)(vi)), the juvenile court found "no evidence of that at all." The court noted that the Tribe had been "part of this case since the beginning . . . . They have been aware of him, aware of his circumstances and consulted on his placement changes, consulted on his development, consulted and kept up-to-date through all the very detailed case reports of what is going on with him." The court noted that the Tribe had been "part of the decision" to terminate parental rights. The court further noted even that the Tribe seemed to believe that termination of parental rights would not sever the child's ties to the Tribe, since until very recently the father had done nothing to foster the child's connection to the Tribe.

At the end of the October 4, 2013 hearing, the juvenile court terminated parental rights and freed the child for adoption. The juvenile court's written orders were filed on October 7, 2013.

---

[2] The juvenile court stated that tribal customary adoptions are available under both state and federal law, but the Department informed the court that "tribal customary adoptions are not federal . . . ."

9

## III.   DISCUSSION

The father contends that the juvenile court erred by terminating parental rights because both the Department and the court failed to comply with the statutory procedures concerning tribal customary adoptions.  The father also contends that there was no substantial evidence to support the juvenile court's finding that termination of parental rights would not substantially interfere with the child's connection to the tribal community.

### A.      *Tribal Customary Adoption Procedures*

A " 'tribal customary adoption' " is an "adoption by and through the tribal custom, traditions, or law of an Indian child's tribe" which does not require termination of parental rights.  (§ 366.24, subd. (a)(1).)  Tribal customary adoption "is an alternative to a standard adoption and protects both the Tribe's and the child's interests in maintaining tribal membership by formalizing an adoption by an individual selected by the Tribe without terminating parental rights."  (*In re A.M.* (2013) 215 Cal.App.4th 339, 348 (*A.M.*).)  Tribal customary adoption (TCA) has been an alternative placement plan for Indian children in California since July of 2010.  (Stats. 2009, ch. 287, § 12; see *In re H.R.* (2012) 208 Cal.App.4th 751, 759 (*H.R.*).)  The Legislature provided for tribal customary adoptions in part because " 'termination of parental rights can disrupt the child's ability to be a full member of the tribe or participate fully in tribal life.' " (*H.R., supra,* at p. 761.)  In a tribal customary adoption, the adoptive parents may be ordered to provide the child with opportunities to participate in tribal culture.  (See *id.* at p. 757.)

"Section 366.24 sets forth the procedures to institute a TCA.  First, the assessment report for the selection and implementation hearing must address the TCA option. (§§ 366.21, subd. (i)(1)(H), 366.24, subd. (b).)  If the Tribe decides that TCA is the appropriate alternative, the Tribe or its designee conducts a home study prior to approval of the TCA placement, including a check of the Child Abuse Central Index and state and federal criminal background checks.  (§ 366.24, subd. (c)(1), (2), & (3).)  This assessment

10

and the TCA order from the Tribe should be completed prior to the selection and implementation hearing and the TCA order should be filed with the court prior to the selection and implementation hearing.  (§§ 366.21, subd. (i)(1)(H), 366.24, subd. (c)(6).)  However, if it is not and the Tribe has identified TCA as the desired permanent placement plan, the juvenile court may continue the selection and implementation hearing for up to 120 days to permit the Tribe to complete the process for TCA and file the TCA order with the juvenile court.  (§ 366.24, subd. (c)(6).)  The juvenile court has discretion to continue the hearing for an additional 60 days to complete the TCA process.  (§ 366.24, subd. (c)(6).)  At the selection and implementation hearing the parties may present evidence to the Tribe on the TCA and the minor's best interest.  (§ 366.24, subd. (c)(7).)  Once the juvenile court affords full faith and credit to the TCA order the child is eligible for TCA placement.  (§ 366.24, subd. (c)(8).)  After the order has been afforded full faith and credit, the TCA parents file an adoption petition.  (§ 366.24, subd. (c)(12).)  Following required reports to the court, a period of supervision and a final decree of adoption, the TCA parents have the same rights as any other adoptive parent and the court terminates jurisdiction over the child.  (§ 366.24, subd. (c)(12), (13) & (14).)"  (*A.M., supra,* 215 Cal.App.4th at p. 348.)

"At the section 366.26 hearing, the juvenile court must find that 'the agency consulted with the child's tribe and the tribe was actively involved in the development of the case plan and plan for permanent placement, including consideration of whether tribal customary adoption is an appropriate permanent plan for the child . . . .'  (Cal. Rules of Court, rule 5.725(d)(8)(C).[3])  If the court finds that the agency did not consult with the child's tribe, it 'must order the agency to consult with the tribe, unless the court finds that the tribe is unable, unavailable, or unwilling to participate.'  (Rule 5.725(d)(8)(D).)"  (*In re G.C.* (2013) 216 Cal.App.4th 1391, 1398 (*G.C.*); see § 366.24, subd. (f) [requiring

---

[3] All further rule references are to the California Rules of Court.

Judicial Council to "adopt rules of court . . . to implement tribal customary adoption as a permanent plan for dependent Indian children"].)

## B. *Failure to Comply With Statutory Procedures*

The father argues that reversal is required because the Department's assessment report for the selection and implementation hearing did not address the option of tribal customary adoption. (See §§ 366.21, subd. (i)(1)(H), 366.24, subd. (b).) Further, according to the father, the trial court failed to find that the Department "consulted with the child's tribe and the tribe was actively involved in the development of the case plan and plan for permanent placement, including consideration of whether tribal customary adoption is an appropriate permanent plan for the child. . . ." (Rule 5.725(d)(8)(C).) The father contends that these errors were prejudicial.

Two published cases have considered similar claims. In *A.M., supra,* 215 Cal.App.4th 339, the tribe contended on appeal that "TCA was not addressed in any of the assessments for the selection and implementation hearing." (*Id.* at p. 350.) At the initial selection and implementation hearing, the trial court had ordered a guardianship and had given the tribe the opportunity to consider TCA. (*Id.* at p. 342.) However, by the time of the second selection and implementation hearing, the tribe had not taken any action to initiate a TCA. (*Id.* at p. 343.)

On appeal, the court found that "[b]ecause there was no tribal order for TCA before it, the juvenile court had no choice but to consider the traditional alternatives for permanent plans. [Citation.]" (*A.M., supra,* 215 Cal.App.4th at pp. 349-350.) The court emphasized that "the initial decision whether to pursue TCA must come from the tribe." (*Id.* at p. 350.) The appellate court rejected the tribe's contention that the Department and the juvenile court were responsible for the "failure to achieve a TCA." (*Ibid.*) Although the TCA law was new at the time of the dependency proceedings, "the Tribe was well aware that the alternative existed at the time of the first selection and implementation hearing." (*Ibid.*) Since the record showed that "the TCA option" had been discussed by

the parties, including the tribe, "[a]ny error in failing to include TCA in the assessment" was harmless. (*Id.* at p. 351.)

In *G.C., supra,* 216 Cal.App.4th 1391, the father presented the same claims of error as in this case. He complained that "the selection and implementation report did not indicate the Department had consulted with the Tribe about tribal customary adoption and did not address the option of tribal customary adoption. And the juvenile court did not find the Department had consulted with the Tribe about tribal customary adoption, did not order the Department to do so, and did not consider the appropriateness of tribal customary adoption as a permanent plan." (*Id.* at p. 1398.)

The *G.C.* court found the father's claims were forfeited by his failure to object during the juvenile court proceedings, but it also found that any error was harmless. (*G.C., supra,* 216 Cal.App.4th at p. 1399.) In that case, the mother had Native American heritage, but the father did not, and the child had been placed in a " 'Designated Indian Home.' " (*Id.* at p. 1395.) By the time of the selection and implementation hearing, the mother intended to relinquish her parental rights. Although the tribe initially did not support termination of parental rights, it informed the juvenile court that in light of the mother's intent to relinquish, it did support adoption and termination. (*Id.* at pp. 1396-1397.)

In explaining why the procedural errors were harmless, the *G.C.* court emphasized that "[t]ribal customary adoption is only an option when the child's tribe identifies it as an option. [Citations.]" (*G.C., supra,* 216 Cal.App.4th at p. 1401.) Although the record did not reflect that the tribe discussed tribal customary adoption with the social worker, the record did reflect that the tribe was involved in the selection of the appropriate permanent plan for the minor. The court had "no reason to speculate that the Tribe was unaware of tribal customary adoption as an alternative permanent plan." (*Ibid.*) Thus the father failed to show "a reasonable probability that compliance with the procedural

13

requirements of tribal customary adoption would have resulted in an outcome more favorable to him." (*Ibid.*)

In the instant case, the Department's assessment did not specifically address the option of tribal customary adoption. Additionally, although the Department did consult with tribal representatives prior to the selection and implementation hearing, it is not clear whether the Department ever asked the Tribe to specifically consider the option of tribal customary adoption. Nevertheless, any error was harmless, as in the cases discussed above. Significantly, the Department consulted with the Tribe throughout the entire dependency process, and the Tribe was involved in selecting a permanent plan for the child, but the Tribe never identified tribal customary adoption as an option. (See *G.C., supra,* 216 Cal.App.4th at p. 1401; *A.M., supra,* 215 Cal.App.4th at pp. 350-351; *H.R., supra,* 208 Cal.App.4th at p. 765 ["tribal customary adoption is an available option only when identified as such by the child's tribe"].) Instead, the Tribe strongly supported the traditional option of adoption with termination of parental rights.

The father contends that the Department's error was prejudicial because, at the selection and implementation hearing, the tribal representative "unequivocally stated she was wholly unaware of the option of TCA." The record does not support the father's assertion. When asked if the Tribe had considered "the possibility of adoption without termination of parental rights," Woods replied, "Yes." Likewise, when asked if she was saying that the Tribe had *not* considered that possibility, Woods replied, "No."

The father points out that Woods later replied "No" when asked, for a third time, whether the Tribe had considered the possibility of adoption without termination of parental rights, and that she replied "No" when asked whether she understood that it was possible for an Indian child to be adopted without termination of parental rights. At most, these responses are ambiguous. Woods was a very experienced expert witness who had testified in many prior termination cases. When her testimony is considered in context, it is apparent that the Tribe had not considered an alternative plan for the child,

14

because under the circumstances it was appropriate to terminate parental rights and free the child for traditional adoption. In particular, Woods emphasized that the father had done nothing to provide the child with a connection to the Tribe until just before the selection and implementation hearing. Woods also indicated that to the extent the Tribe had not considered tribal customary adoption, she was "answering that question as of now."

In sum, because the Tribe never identified tribal customary adoption as an option, because the Tribe was involved in the selection of the appropriate permanent plan for the child, and because the record shows that the Tribe was aware of tribal customary adoption at the time of the selection and implementation hearing, the father has failed to show "a reasonable probability that compliance with the procedural requirements of tribal customary adoption would have resulted in an outcome more favorable to him." (*G.C., supra,* 216 Cal.App.4th at p. 1401.)

## C.    *Indian Child Exception*

The father contends the juvenile court erred by finding that termination of parental rights would not substantially interfere with the child's connection to the tribal community. (See § 366.26, subd. (c)(1)(B)(vi).) He contends the juvenile court's determination is not supported by substantial evidence.

"When the juvenile court finds that the child is adoptable, it must terminate parental rights unless it finds one of four specified circumstances in which termination would be detrimental (§ 366.26, subd. (c)(1)(A)-(D))." (*In re Brittany C.* (1999) 76 Cal.App.4th 847, 852.) Our Supreme Court has instructed that "[t]he specified statutory circumstances—actually, *exceptions* to the general rule that the court must choose adoption where possible—'must be considered in view of the legislative preference for adoption when reunification efforts have failed.' [Citation.]" (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)

15

At issue in the present case is the exception provided by section 366.26, subdivision (c)(1)(B)(vi), which provides: "The child is an Indian child and there is a compelling reason for determining that termination of parental rights would not be in the best interest of the child, including, but not limited to: [¶] (I) Termination of parental rights would substantially interfere with the child's connection to his or her tribal community or the child's tribal membership rights. [¶] (II) The child's tribe has identified guardianship, long-term foster care with a fit and willing relative, tribal customary adoption, or another planned permanent living arrangement for the child. [¶] (III) The child is a nonminor dependent, and the nonminor and the nonminor's tribe have identified tribal customary adoption for the nonminor."

A parent claiming the Indian child exception to termination of parental rights has the burden of proof. (*In re C.B.* (2010) 190 Cal.App.4th 102, 133.) On appeal, "the abuse of discretion standard governs review." (*Id.* at p. 123.) More specifically, " 'the trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious.' [Citations.]" (*Ibid.*; see *In re A.A.* (2008) 167 Cal.App.4th 1292, 1322 ["whether a compelling reason exists under the Indian Child Exception is an issue committed to the trial court as the trier of fact and its discretion to resolve whether, on any statutory grounds, that termination would be detrimental to an otherwise adoptable child"].)

The father first argues that because the Department did not discuss the option of tribal customary adoption in its section 366.26 report, there is no substantial evidence that "termination of parental rights was in [the child's] best interest, rather than a TCA." However, as we have explained, the Tribe never identified tribal customary adoption as an option. (See *G.C., supra,* 216 Cal.App.4th at p. 1401; *A.M., supra,* 215 Cal.App.4th at pp. 350-351; *H.R., supra,* 208 Cal.App.4th at p. 765 ["tribal customary adoption is an available option only when identified as such by the child's tribe"].) Rather, the Tribe

16

strongly supported termination of parental rights in this case. Thus, the trial court did not abuse its discretion by failing to find that tribal customary adoption was a compelling reason for determining that termination of parental rights was not in the child's best interests.

The father also argues it was speculative for the juvenile court to find that the child "could maintain tribal ties" even if parental rights were terminated. However, the juvenile court did not make such a finding. Rather, the court found that termination of parental rights would not sever any *existing* tribal ties, since the father had made no efforts to foster the child's connection to the Tribe until just before the selection and implementation hearing. That finding was supported by the testimony of Woods, who emphasized that the child had no current connection to the Tribe.

In sum, the juvenile court did not abuse its discretion by finding the Indian child exception to termination of parental rights inapplicable in this case.

## IV.   DISPOSITION

The October 4, 2013 and October 7, 2013 orders terminating parental rights and selecting adoption as the permanent plan are affirmed.

_____
BAMATTRE-MANOUKIAN, ACTING P.J.


WE CONCUR:


_____
MIHARA, J.


_____
GROVER, J.

17