Filed 1/15/16  In re Emma H. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re EMMA H., a Person Coming Under the Juvenile Court Law. | D068305 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J1518288F) |
| v. | |
| S.M. et al., | |
| Defendants and Appellants. | |

APPEALS from an order of the Superior Court of San Diego County, Laura Birkmeyer, Judge.  Affirmed.

Nicole Williams, under appointment by the Court of Appeal, for Defendant and Appellant S.M.

Monica Vogelmann, under appointment by the Court of Appeal, for Defendant and Appellant Joseph H.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

S.M., a citizen of the Muscogee (Creek) Nation, and Joseph H., a member of the Oglala Lakota Nation, challenge an order terminating their parental rights to their daughter, Emma H., under Welfare and Institutions Code section 366.26. They contend the juvenile court violated the Indian Child Welfare Act (ICWA), title 25 United States Code section 1901 et seq. and the State Indian Child Welfare Act (the Act), Welfare and Institutions Code section 224 et seq.

S.M. argues the juvenile court erred when it did not direct an appropriate individual or agency to provide active efforts to secure tribal membership for the child. (Cal. Rules of Court, rules 5.482(c), 5.484(c)(2).)[1] She contends the order terminating parental rights must be reversed and the matter remanded to the juvenile court with directions to direct the San Diego County Health and Human Services Agency (the Agency) to make active efforts to secure Emma's tribal membership. Joseph joins in S.M.'s argument. He also contends the juvenile court erred when it did not consider tribal customary adoption as an alternative permanency plan for Emma, and that the juvenile

_____

1    Unless otherwise indicated, further rule references are to the California Rules of Court.

court violated ICWA placement preferences throughout Emma's dependency case without making the required findings of good cause.

We conclude that the juvenile court and the Agency did not fully comply with rules of court mandating active efforts to secure tribal membership for an Indian child. Nevertheless, the Agency subsequently made active efforts to secure tribal membership for Emma.[2] The record permits the reasonable inference that termination of parental rights will not interfere with Emma's tribal membership rights because she is a lineal descendant of a Muscogee (Creek) Indian by blood whose name appears on the tribe's final rolls of 1906. (Const. of the Muscogee (Creek) Nation, art. I, § 1, art. III, §§ 2, 3, 4.) Thus, unlike circumstances in which tribal membership rights are lost by termination of parental rights or adoption, the error is not prejudicial and does not require reversal.

We also conclude that the juvenile court was not required to consider customary tribal adoption because the tribe did not request an alternative permanency plan or object to termination of parental rights. With respect to ICWA placement preferences, the record shows that the juvenile court made a good cause finding when placing Emma in foster care with her half siblings. Although the juvenile court should have considered

_____

2     We grant the Agency's unopposed motion to augment the record with a court report and attachments, including Emma's Tribal Citizenship Application, which was filed in, and reviewed by, the juvenile court on October 20, 2015. On our own motion, we take judicial notice of the Constitution of the Muscogee (Creek) Nation. (Evid. Code, § 452, subd. (a); Welf. & Inst. Code, § 224.5; *Big Valley Band of Pomo Indians v. Superior Court* (2005) 133 Cal.App.4th 1185, 1192.)

ICWA placement preferences at the Welfare and Institutions Code section 366.26 hearing, Joseph has waived this issue on appeal. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Emma is the youngest of S.M.'s nine children, five of whom were dependents of the juvenile court at the time of Emma's birth in April 2014. Joseph is Emma's father.[3] Because of S.M.'s unresolved mental health issues and Joseph's status as a registered sex offender, the Agency detained Emma in protective custody and filed a Welfare and Institutions Code section 300 petition on her behalf.

By the time Emma was born, S.M. had received more than 18 months of reunification services in the siblings' dependency cases. Four of Emma's siblings were placed in foster care, pending permanent placements. The oldest sibling was in an out-of-county group home.

S.M. is a citizen of the Muscogee (Creek) Nation (the Tribe). Joseph is a member of the Oglala Lakota Nation (the Nation).[4] Emma is eligible for membership in the Tribe. Two of Emma's siblings are enrolled members of the Tribe; the others are eligible for enrollment. Although the Tribe had intervened in the siblings' dependency cases, it declined to do so in Emma's case, stating the Tribe was not intervening in any new out-

3     Joseph is not the father of S.M.'s other children. For brevity, we refer to Emma's half siblings as her siblings.

4     The Agency sent notice to the Nation and followed up with a telephone call asking about Emma's eligibility for enrollment. There is nothing in the record to indicate the Nation responded to the Agency's notice or inquiry.

4

of-state cases at that time. In a formal letter, the Tribe said Emma's case did not meet statutory requirements for intervention.[5] Tribal representative Steve Brennan said the Tribe would not provide any input in Emma's case. He asked the Agency to "work towards identifying a plan to keep the siblings together and that will satisfy the spirit of ICWA or a home that would be willing to keep the children exposed to their Native American heritage."

S.M. and Joseph did not identify any relative who could care for Emma. They asked the Agency to evaluate a friend for placement but the friend said she could only care for Emma for a few weeks. The Agency detained Emma in foster care with four of her siblings.

At the disposition hearing, the juvenile court found there was good cause to place Emma in a foster home not in accordance with ICWA placement preferences, and maintained her placement with her siblings. The court ordered the Agency to provide reunification services to S.M. and denied services to Joseph.

Emma was described as a bright and bubbly baby with a very sweet disposition. In August, because of supervision and safety concerns, Emma and two of her siblings

---

5      The following requirements must be met under the Muscogee (Creek) Nation Code to intervene in an out-of-state child custody proceeding: there must be sufficient funds available for effective intervention and monitoring; there must be sufficient staff time to travel outside the State of Oklahoma; intervention must be necessary to protect the rights of the Nation, the children, or the children's family; the case has the potential to set valuable precedent regarding tribal rights under ICWA; and there must be an attorney in the Muscogee (Creek) Nation Department of Justice or an attorney that is under contract with the tribe and is licensed to practice law in the jurisdiction.

were moved as a sibling set to another foster home. However, that foster parent, who was in the process of providing a permanent home to two of Emma's siblings, did not want to work with the family reunification case plan in Emma's case. The Agency then placed five-month-old Emma with another caregiver who was related to Emma's previous foster parent. Emma had weekly visits with the two siblings who were in the care of the related foster parent. The Agency made arrangements for Emma to visit her other dependent siblings, but those visits were less frequent.

S.M. said she was happy with Emma's placement and care. The parents' visits with Emma were consistent and appropriate. Joseph sang Native American songs to Emma while rocking her to sleep. S.M. spoke to Emma in her Native American Indian language and sang tribal songs to her. Despite participating in reunification services, S.M. did not make substantial progress in meeting the goals of her case plan. The juvenile court terminated reunification services at the six-month review hearing and set a Welfare and Institutions Code section 366.26 hearing, which was heard on June 1, 2015.

The social worker contacted Brennan to obtain a declaration from the Tribe about its position on termination of parental rights. Brennan did not respond. The Indian expert witness, Misty Taylor, sent Brennan an e-mail stating her position that Emma not be returned home. She asked whether Emma was enrolled in the Tribe, and added, "I am concerned that if she is adopted it will alter her birth certificate and may affect her enrollment eligibility in the future."

6

On May 15, in an e-mail to Taylor, Brennan said Emma was eligible for enrollment with the Tribe. He wrote, "The tribe has chosen to not intervene in this portion of the case. Emma is not enrolled at this time. If it would help, I can contact [the social worker] and explore the possibilities of sending an enrollment application to her. She may be able to supply the necessary documentation and complete the application to enroll Emma."

The same day, Taylor sent an e-mail to the social worker asking if the social worker could complete Emma's application for enrollment and offered to assist with the application, if necessary. On May 19, the social worker asked Taylor to send an enrollment application to her, and sent a copy of the e-mail to Brennan.

At a pretrial conference on May 20, county counsel informed the juvenile court the Agency had not received any response from Brennan. Taylor said Brennan told her the Tribe would not participate in the hearing but mentioned keeping the siblings together. Taylor said the Tribe wanted a particular outcome in the case but was not intervening. In her opinion, the Tribe's position was "kind of strange."

Taylor informed the juvenile court she had asked Brennan about Emma's enrollment in the Tribe. The juvenile court asked Taylor to forward Brennan's e-mail to the social worker. The social worker said she had a copy of the e-mail, but Brennan would not respond to her telephone calls or e-mail messages.

During the pretrial conference, the juvenile court telephoned Brennan and left the following message on his voice mail: "This is Judge Laura Birkmeyer calling from the

San Diego Superior Court. We are on the record regarding child Emma H. I have been advised in court on the record that the Health and Human Services Agency in this matter has had extreme difficulty in reaching you and getting your tribe's position with respect to this trial. I'm notifying you that we have a trial scheduled in this case . . . . Of course, we would welcome the tribe's participation, and I'm strongly urging you to directly communicate with the social worker in this case. . . . But it is imperative that we learn the position of the tribe."

On May 28, the social worker e-mailed Brennan to inquire about Emma's enrollment application and whether he was available to testify at the hearing. Brennan replied he sent the enrollment application to the social worker on May 26. He did not believe he could "testify in a court action in which the Tribe has chosen to not intervene (Emma's portion of the case)."

In its report to the court, the Agency said it was aware of the importance of addressing the children's needs and preserving their Native American heritage. The Agency identified Emma's current foster home as an adoptive placement. Emma's caregivers considered her a part of their family and loved her very much. Emma was a happy, playful and active toddler, with no developmental concerns. Her favorite words were "what's that?" and "zebra." The caregivers were diligent in educating themselves about Emma's Native American Indian heritage.

The Agency did not plan to move Emma from her current placement. However, if the juvenile court did not approve the placement, the Agency would try to place Emma

8

with her siblings in an adoptive home that promoted their Native American heritage. There were currently 14 approved San Diego County adoptive homes willing to adopt an American Indian group of three children, and three approved San Diego County adoptive homes willing to adopt an American Indian group of five children.

At the section 366.26 hearing, the juvenile court admitted in evidence the Agency's court reports, which included copies of the tribal representative's e-mail correspondence, the declaration of the Indian expert witness, and the court-appointed special advocate's report. The parents and the child did not present any affirmative evidence or cross-examine any witnesses. S.M. argued the beneficial parent/child relationship and sibling bond exceptions applied, and Joseph asked the juvenile court to apply the beneficial parent/child relationship exception to termination of parental rights.

The juvenile court found there was clear and convincing evidence to show that active efforts were made to prevent the breakup of the Indian family, and there was evidence beyond a reasonable doubt, based in part upon the testimony of a qualified expert witness, to show that continued custody was likely to result in serious emotional or physical damage to the child. The juvenile court determined that Emma was adoptable and there were no applicable exceptions to termination of parental rights, and terminated parental rights.

On October 20, the Agency filed a report with the juvenile court regarding Emma's Tribal Citizenship Application, including copies of the completed application, required

supporting documents, and the Tribe's application checklist.  The Agency mailed Emma's completed application to the Tribe on October 12.

DISCUSSION

A

*Overview and Issues on Appeal*

"ICWA was designed to protect the best interests of Indian children and promote the stability and security of Indian tribes and families by establishing minimum federal standards for the removal of Indian children from their families by state courts and the placement of such children in foster or adoptive homes."  (*In re Jack C., III* (2011) 192 Cal.App.4th 967, 975-976 (*Jack* C.).)  To accomplish this goal, ICWA sets forth minimum substantive and procedural standards to protect the interests of Indian children and their families and tribes.  (*Jack C.*, *supra*, at p. 977.)

In California, the Legislature enacted a comprehensive reorganization of statutes to fully effectuate ICWA in state Indian child custody proceedings.  (*Jack C.*, *supra*, 192 Cal.App.4th at p. 977.)  In certain respects, California's ICWA scheme provides greater protections for Indian children, their tribes and parents than the federal ICWA.  If a state or federal law provides a higher level of protection to the rights of the parent or Indian guardian of an Indian child, the higher standard shall prevail.  (25 U.S.C. § 1921; Welf. & Inst. Code, § 224, subd. (d) [the higher standard of protection also applies to the rights of the child Indian tribe].)

10

S.M. and Joseph argue the juvenile court did not comply with rules 5.482(c) and 5.484(c)(2), which require active efforts to secure tribal membership for a child who is eligible for membership in a tribe. Joseph contends the juvenile court did not comply with Welfare and Institutions Code section 366.24, which governs consideration of tribal customary adoption as an alternative permanency plan. He also maintains the juvenile court deviated from ICWA placement preferences without making findings of good cause.

B

*Active Efforts to Secure Tribal Membership*

S.M. and Joseph argue there is not substantial evidence to support the finding that active efforts were made to provide remedial services and rehabilitative program designed to prevent the breakup of the Indian family (active efforts finding) because the Agency did not make any attempt to enroll Emma into the Tribe. They emphasize the Indian expert witness's concern that adoption might interfere with Emma's eligibility for enrollment.

The Agency contends the parents have forfeited this issue by not raising it at trial. (*In re Dakota H*. (2005) 132 Cal.App.4th 212, 221-222 [a party forfeits the right to claim error as grounds for reversal on appeal when the party fails to raise the objection in the trial court].) Generally, issues not raised in the trial court cannot be raised on appeal. (*In re Javier G*. (2006) 137 Cal.App.4th 453, 464.) However, an appellate court is generally

11

not prohibited from reaching a question that has not been preserved for review by a party. (*People v. Williams* (1998) 17 Cal.4th 148, 161, fn. 6.)

The United States Congress and the California Legislature have authorized any court of competent jurisdiction to invalidate a state court judgment involving an Indian child upon a showing that such action violated any provision of title 25 United States Code sections 1911 (tribal jurisdiction), 1912 (notice and active efforts), or 1913 (voluntary placement).  (25 U.S.C. § 1914; Welf. & Inst. Code, § 224, subd. (e).)  Title 25 United States Code section 1912(d) and Welfare and Institutions code section 361.7, subdivision (a), require that any party seeking termination of parental rights to an Indian child must show that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family.  In California, those efforts "must include pursuit of any steps necessary to secure tribal membership for a child if the child is eligible for membership in a given tribe, as well as attempts to use the available resources of extended family members, the tribe, tribal and other Indian social service agencies, and individual Indian caregivers."  (Rule 5.484(c)(2).)  The failure to use active efforts to secure tribal membership is subject to collateral attack under federal and state law.  (See *Doe v. Mann* (9th Cir. 2005) 415 F.3d 1038, 1041-1042 [reviewing ICWA issue under 25 U.S.C. § 1914 that was not raised in the state court dependency proceeding].)  In the interests of judicial economy, we exercise our discretion to review this issue.

If a tribe indicates the child is eligible for membership if certain steps are followed, the court must direct the appropriate individual or agency to provide active efforts to secure tribal membership for the child. (Rule 5.482(c); see also Bureau of Indian Affairs, Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, Guidelines, 80 Fed. Reg. No. 37 (Feb. 25, 2015), § B.4(d)(iii) [in the event the child is eligible for membership in a tribe but is not yet a member of any tribe, the agency should take the steps necessary to obtain membership for the child in the tribe that is designated as the Indian child's tribe].) Active efforts are assessed on a case-by-case basis and shall utilize the available resources of the Indian child's extended family, tribe, tribal and other Indian social service agencies, and individual Indian caregiver service providers. (Welf. & Inst. Code, § 361.7, subd. (b).)

At the May 20 pretrial conference, the juvenile court learned that Taylor, the Indian expert witness, was concerned that adoption might affect Emma's enrollment eligibility and recommended that she be enrolled in the Tribe. Taylor contacted tribal representative Brennan, who suggested that the social worker could supply the necessary documentation and complete Emma's enrollment application. The juvenile court verified the social worker had a copy of Brennan's e-mail, but did not order any person or agency to complete Emma's application.

After the pretrial conference, the social worker contacted Brennan, who confirmed he sent an enrollment application to the social worker on May 26. On June 1, the juvenile court made an active efforts finding and terminated parental rights. The record

13

indicates the social worker mailed an incomplete application to Emma's tribe on October 5, and a completed application on October 12.

The parents fault the Agency for not making active efforts to enroll Emma in her tribe.[6] We do not read rule 5.482(c) as *necessarily* placing the burden of providing active efforts to secure tribal membership for an Indian child *on the agency*. Instead, the juvenile court has the duty to direct *the appropriate individual or the agency* to provide active efforts to secure tribal membership for the child. (Rule 5.482(c).) Thus, the better practice is when a tribe indicates the child is eligible for membership, the juvenile court should assess whether the agency should be tasked with the duty of trying to secure tribal membership for the child, or whether there is another appropriate individual who can perform that task effectively. The juvenile court should direct that individual or agency to provide active efforts to secure tribal membership for the child. The juvenile court is required at each review hearing to make an active efforts finding. (Welf. & Inst. Code, § 366, subd. (a)(1)(B).) Under rules 5.482(c) and 5.484(c)(2), in making that finding, the court should review the steps taken to secure tribal membership for the child.

Here, the juvenile court did not explicitly task the social worker with completing Emma's membership application, and her application was neglected until the issue was

---

6      In his reply brief, Joseph asserts the Agency did not make efforts to enroll Emma in the Nation. The record shows the Agency properly noticed the Nation of Emma's dependency proceedings, including the Welfare and Institutions Code section 366.26 hearing, and the Nation received those notices but did not respond. The Nation did not indicate that Emma was eligible for membership; thus, the Agency has no duty to make active efforts to enroll her in the Nation. (Rule 5.482(c).)

raised on appeal. On this record, the parents cannot show the error was prejudicial. They did not oppose the Agency's motion to augment the record on appeal with information showing the social worker completed Emma's enrollment application and submitted it to the Tribe. Significantly, the record shows that Brennan did not express any concern that termination of parental rights would interfere with enrollment. Indeed, although parental rights had been terminated in the siblings' cases, Brennan informed the social worker that she could also complete enrollment applications for those siblings who were not yet enrolled in the Tribe.

Article I, section 1, and Article III, sections 2 and 3(b) of the Constitution of The Muscogee (Creek) Nation confer citizenship rights on any person who is a lineal descendant of a Muscogee (Creek) Indian by blood whose name appears on the final rolls of 1906, and who is not an enrolled member of another tribe, nation or pueblo. The Tribe's "Checklist for Citizenship" indicates that when an adopted person applies for membership, he or she must submit a certified copy of the petition and final adoption decree. There is no showing that the delayed effort to secure Emma's tribal membership prejudiced her interest in being a member of her Tribe, or the Tribe's interest in having Emma as a member, in violation of ICWA.

C

*Tribal Customary Adoption*

Tribal customary adoption "is an alternative to a standard adoption and protects both the Tribe's and the child's interests in maintaining tribal membership by formalizing

15

an adoption by an individual selected by the Tribe without terminating parental rights." (*In re A.M.* (2013) 215 Cal.App.4th 339, 348 (*A.M.*); Welf. & Inst. Code, § 366.24, subd. (a)(1) [tribal customary adoption means adoption by and through the tribal custom, tradition, or law of an Indian child's tribe].) Termination of parental rights is not required to effect tribal customary adoption. (Welf. & Inst. Code, § 366.24, subd. (a)(1).)

Joseph contends the juvenile court did not consider tribal customary adoption as required by Welfare and Institutions Code section 366.24. He argues the court did not make findings required under rule 5.708(d), governing review hearings, and rule 5.725(d)(8), governing the Welfare and Institutions Code section 366.26 hearing. Joseph seeks reversal of the order terminating parental rights and remand for compliance with Welfare and Institutions Code section 366.26.

At every review hearing and the Welfare and Institutions Code section 366.26 hearing, the juvenile court must find that "the agency consulted with the child's tribe and the tribe was actively involved in the development of the case plan and plan for permanent placement, including consideration of whether tribal customary adoption is an appropriate permanent plan for the child." (Rule 5.725(d)(8)(C).) If the court finds that the agency did not consult with the child's tribe, it "must order the agency to consult with the tribe, unless the court finds that the tribe is unable, unavailable, or unwilling to participate." (Rule 5.725(d)(8)(D); *In re G.C.* (2013) 216 Cal.App.4th 1391, 1398.)

The Tribe clearly stated throughout Emma's dependency case that it would not intervene and would not comment on her permanency plan. The social worker, in

16

preparing the assessment report, contacted the tribal representative to obtain a declaration from the Tribe about its position on termination of parental rights. The Tribe did not respond to the social worker's inquiries. In an e-mail exchange with the Indian expert witness, the tribal representative reiterated the Tribe's decision not to intervene in Emma's case. When the tribal representative finally contacted the social worker, he declined to testify, stating the Tribe had chosen to not intervene. The Agency fulfilled its obligation to consult with the Tribe and seek its active involvement in the development of the case plan and plan for permanent placement. The tribal representative made it clear that the Tribe would not participate. Thus, the Tribe was "unable, unavailable, or unwilling to participate" in her case. (Rule 5.725(d)(8)(D).)

Any error by the juvenile court in not making the required findings on the record is harmless. (Rule 5.725(d)(8)(D).) The initial decision to pursue tribal customary adoption must come from the tribe. (*A.M.*, *supra*, 215 Cal.App.4th at p. 350.) The Tribe did not identify tribal customary adoption as a permanency plan option for Emma. It did not object to termination of parental rights. The Indian expert witness concurred with the Agency's recommendation of adoption with termination of parental rights. The record also shows that the Tribe intervened in the siblings' cases. The juvenile court terminated parental rights in three of those cases, allowing the reasonable inference the Tribe did not request tribal customary adoption in those cases. Thus, Joseph does not show that the juvenile court's failure to make the findings required under rule 5.725(d)(8)(C) creates "a reasonable probability that compliance with the procedural requirements of tribal

17

customary adoption would have resulted in an outcome more favorable to him."  (*In re G.C.*, *supra*, 216 Cal.App.4th at p. 1401.)

D

*Placement*

Joseph asserts the order terminating parental rights should be reversed because the Agency and the juvenile court allegedly failed to apply the placement preferences mandated by title 25 United States Code section 1915 and Welfare and Institutions Code section 361.31 with regard to Emma's foster care and preadoptive[7] placements, and did not make any finding there was good cause to deviate from the placement preferences.

Title 25 United States Code section 1915(b), mandates that "[i]n any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with (i) a member of the Indian child's extended family; (ii) a foster home licensed, approved, or specified by the Indian child's tribe; (iii) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or (iv) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs."  (Welf. & Inst. Code, § 361.31, subd. (b).)

---

7      Emma's adoptive placement has not been finalized.  "In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families."  (25 U.S.C. § 1915; Welf. & Inst. Code, § 361.31, subd. (c).)

Title 25 United States Code section 1915 governs placement preferences. As noted earlier in this opinion, any court of competent jurisdiction has the authority to invalidate a state court judgment involving an Indian child upon a showing that such action violated any provision of title 25 United States Code sections 1911, 1912, or 1913. (25 U.S.C. § 1914; Welf. & Inst. Code, § 224, subd. (e).) Unlike those provisions, title 25 United States Code section 1914 does not authorize invalidation of an order terminating parental rights by showing a violation of placement preferences under section 1915. (*B.R.T. v. Executive Dir. of Soc. Serv. Bd. N. Dakota* (1986) 391 N.W.2d 594, 600-601.) Instead, a party is limited to challenging an alleged violation of ICWA placement preferences on direct appeal.

Joseph did not file an appeal challenging the placement orders made prior to the section 366.26 hearing, and the time in which he was permitted to do so has long since passed. (Rule 8.104.) "An appellate court in a dependency proceeding may not inquire into the merits of a prior final appealable order on an appeal from a later appealable order . . . ." (*In re Merenda P.* (1997) 56 Cal.App.4th at 1143, 1151.) We therefore need not consider his claim the juvenile court violated ICWA placement preferences prior to the appealed-from hearing.[8]

---

8    Joseph's assertion the juvenile court did not make any finding of good cause is not supported by the record. On May 22, 2014, at the settlement conference for the jurisdiction and disposition hearing, the juvenile court found there was good cause to place the child in a foster home not in accordance with ICWA placement preferences.

With respect to the Welfare and Institutions Code section 366.26 hearing, the parties (and the Tribe) did not raise this issue in the juvenile court. And, because S.M. said she was happy with Emma's placement and felt that Emma was well cared for by her foster parents, any error is harmless. Thus, Joseph is precluded from raising the issue on appeal. (*In re Dakota H*., *supra*, 132 Cal.App.4th at pp. 221-222 [a party forfeits the right to claim error as grounds for reversal on appeal when the party fails to raise the objection in the trial court].)

## DISPOSITION

The order terminating parental rights is affirmed.

_____
HALLER, J.

WE CONCUR:


_____
McCONNELL, P. J.


_____
BENKE, J.