Filed 6/17/14

**CERTIFIED FOR PUBLICATION**


**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**


| | |
|---|---|
| In re I.P., a Person Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | E060213 |
| Plaintiff and Respondent, | (Super.Ct.No. J239345) |
| v. | OPINION |
| M.P., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Cheryl C. Kersey, Judge. Affirmed.

Pamela Rae Tripp, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Jeffrey L. Bryson, Deputy County Counsel, for Plaintiff and Respondent.

On appeal, defendant and appellant M.P. (Mother) contends that the juvenile court erred in terminating her parental rights as to her seven-year-old son, I.P. (the child), because the child is an Indian child (see 25 U.S.C. § 1903(4); Welf. & Inst. Code § 224.1, subd. (a)),[1] and the juvenile court failed to follow the required statutory procedures regarding tribal customary adoptions. For the reasons stated below, we will affirm the juvenile court's orders.

## I

## FACTUAL AND PROCEDURAL BACKGROUND

The child came to the attention of the San Bernardino County Children and Family Services (CFS) in June 2011 when the child and his seven-year-old half-sister, A.G. (the children), were found walking by themselves down a busy street in Barstow. Law enforcement responded and the children led the officers to their home. The officers found the front door to be wide open and Mother and several other people asleep inside. The home was dirty, cluttered, and contained very little edible food for the children. The officers also found smoke pipes and small bags of marijuana and methamphetamine throughout the home. Mother admitted to using marijuana and methamphetamine on a daily basis.

The children were very hungry and dirty—their home did not have hot water. The child looked pale and bony, his eyes appeared weak, and he met the growth weight

_____

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

standard for failure to thrive.  Mother was arrested on child endangerment charges and the children were taken into protective custody.[2]  The children repeatedly reported that they wanted to go to the home of their maternal aunt, S.D. (Aunt).[3]  Following a relative assessment, the children were placed with Aunt and her husband.  Aunt has 4/4 Navajo blood and is a member of the Navajo Nation.

On June 13, 2011, CFS filed a petition under section 300, subdivisions (b) [failure to protect] and (g) [no provision for support], alleging that the child, age four, came within the jurisdiction of the juvenile court.  A petition was also filed as to the child's half-sister, who had a different father.  The petition alleged that the child had suffered or was at a substantial risk of suffering serious physical harm or illness due to Mother's substance abuse, failure to adequately supervise and protect the child, failure to bathe the child, the child's failure to thrive, and the living conditions in the home.  Regarding the allegation that the child had been left without any provision for support, the petition alleged that Mother was arrested and incarcerated for child endangerment and that Father's whereabouts were unknown.

At the detention hearing held on June 14, 2011, the juvenile court found a prima facie case showing that the child came within section 300, and that continuing to allow

---

[2]  The whereabouts of the child's father, R.H. (Father), were initially unknown; a search later revealed that Father was in state prison.  Mother also had another child, L.E.  L.E.'s paternal grandparents have had guardianship of this child since she was two years old.  This appeal does not involve the child's half-siblings, A.G. and L.E.

[3]  Aunt reported that in 2008 she had the children in her care because Mother was "greatly neglecting" the children's needs.

the child to remain in the home of the parent was contrary to the child's welfare. The court ordered the child and his half-sister maintained in Aunt's home. Mother reported that the children's maternal grandmother was American Indian, specifically from the Navajo Tribe.

CFS filed a jurisdiction/disposition report on June 30, 2011. CFS recommended that the allegations in the petition be found true and that Mother be provided with reunification services, but that no services be provided to Father because he was found to be an alleged father. CFS noted that the Indian Child Welfare Act (ICWA) does or may apply. Mother was in agreement with the children being placed in Aunt's home.

A court-ordered mediation hearing was held on July 28, 2011. At that time, Mother submitted to the allegations in the petition. In addition, as to disposition, CFS and Mother agreed to a case plan to include individual counseling, parenting classes, substance abuse treatment, random drug testing, and a 12-Step program.

On August 3, 2011, CFS provided ICWA notices to the Colorado River Tribal Council tribes, the Navajo Nation tribes, and the Bureau of Indian Affairs.

The jurisdictional/dispositional hearing was held on August 5, 2011. Mother waived her rights and submitted the petition on the social worker's reports. The juvenile court sustained the petition, declared the child and his half-sister A.G. dependents of the court, and adopted CFS's recommendations. Specifically, the court continued the child and A.G. in the home of Aunt, ordered reunification services as to Mother and A.G.'s father, and denied reunification services as to the child's father.

On August 16, 2011, the Navajo Nation (the Tribe) responded indicating the child and A.G. were eligible for membership and the Tribe was intervening. The Tribe also noted that it had assigned an ICWA social worker who worked with the Navajo Children and Family Services to the case. The Tribe requested documents related to the case and copies of the children's birth certificates, social security cards, medical records, and school records. CFS provided the requested documents to the ICWA social worker. The court found that ICWA did apply.

Mother was making progress in her court-ordered case plan, and by the six-month review hearing CFS recommended continuing Mother's reunification services. The child and A.G. had adjusted well to their relative placement, and appeared comfortable, with no emotional or developmental concerns. The children were thriving in Aunt's home, and had developed a "strong bond" with Aunt. Aunt was committed to giving the children a safe and nurturing home until the children could return to Mother. Aunt had also developed a bond with the children; she was "protective . . . and genuinely concerned about their welfare"; and was observed to be "loving and patient with the children." The concurrent plan for the children was legal guardianship with Aunt.

CFS notified the Tribe that a review hearing was scheduled for February 6, 2012, and that CFS was recommending "No change in orders, services, placement, custody, or status." There is no indication in the record that the Tribe responded to this notice or attended the review hearing.

At the February 6, 2012 six-month review, the juvenile court adopted CFS's recommendations, continuing reunification services. The court also authorized Mother to have liberalized and unsupervised visits with the children. However, a few months later, Mother's visits reverted back to supervised after she tested positive for amphetamines and admitted to being under the influence of drugs at the last unsupervised visit.

In July, CFS notified the Tribe that the next review hearing was set for August 6, 2012, and that CFS intended to recommend Mother's services be terminated.

On July 11, 2012, CFS Social Worker Joanne Watts (SW Watts) signed a form that checked a box next to the following preprinted language: "[I.P.] is an Indian child and termination of parental rights would not be in the best interest of the child due to substantial interference with the child's connection to his/her tribal community or tribal membership rights, or the tribe has identified guardianship, long term foster care with a fit and willing relative or other planned permanent living arrangement for the child."

CFS filed its 12-month review report on August 6, 2012. CFS recommended the juvenile court terminate reunification services as to Mother and set a hearing pursuant to section 366.26 to establish a permanent plan of legal guardianship for the child.[4] A month after Mother completed her outpatient substance abuse program she relapsed and began using again. She also missed several of her drug testing appointments, was arrested, and was inappropriate during visits. It was unknown how long Mother could

---

[4] As to A.G., CFS recommended that she be continued in Aunt's home and that her father continue to receive reunification services.

6

remain sober. The children were still placed with Aunt and her husband and were doing well.

The 12-month review hearing was continued to December 10, 2012, for Mother's contest. There is no indication in the record that the Tribe attended the August 6, 2012 review hearing.

By the December 10, 2012 18-month-review hearing, Mother had made substantial progress in her case plan and CFS recommended that the children be returned to Mother on family maintenance services. On November 20, 2012, CFS mailed the Tribe a notice of the 18-month review hearing.[5] The juvenile court adopted CFS's recommendations and returned the children to Mother's home. There is no indication in the record that the Tribe responded to this notice or attended the December 10, 2012 hearing.

However, by January 2013, Mother had relapsed and was using marijuana and methamphetamine, and she was arrested on March 21, 2013. Additionally, there were new allegations that Mother had physically abused the child and had instructed the children to lie about how the child sustained his injuries. When the social worker visited the children's school, the social worker noticed the child's eyelid to be swollen and he had bruising on the left side of his face. The child initially reported that he fell off a

_____

[5] The notice also included the social worker's new recommendation of returning the children to Mother on family maintenance.

scooter, but then stated Mother had hit him after she became angry at him. The children were taken into protective custody and placed with A.G.'s paternal aunt S.G.

On March 27, 2013, CFS filed a petition under sections 342 (subsequent) and 387 (supplemental). The children were formally detained on March 28, 2013, and maintained with S.G.

In a jurisdictional/dispositional report for the subsequent/supplemental petition, CFS recommended no reunification services for Mother. Mother continued to abuse drugs and had failed to sustain sobriety, resulting in her arrests and abuse of the child. Mother had been released from jail on March 22, 2012, but was arrested again on April 11 for violating her probation.

The contested jurisdictional/dispositional hearing on the subsequent/supplemental petition was held on May 2, 2013. Mother was present but in custody of the county jail. The juvenile court sustained the petition, declared the child a dependent of the court, and maintained him in the home of S.G. Mother was denied reunification services pursuant to section 361.5, subdivision (b)(13) (chronic substance abuse), and the court set a section 366.26 permanency planning hearing for the child.[6]

CFS filed its section 366.26 report on November 5, 2013. CFS had made several attempts to contact the Tribe ICWA social worker. After the child was removed in March 2013, CFS had also been in contact with an ICWA expert, Phil Powers, a member

---

[6] A.G.'s dependency case was dismissed with a family law order in favor of her father, F.G.

8

of the Cherokee Nation of Oklahoma. CFS had informed the Tribe that it was recommending adoption by Aunt with termination of parental rights and had faxed a copy of the 366.26 report to the Tribe. CFS also informed the Tribe that the child was placed with a relative caregiver, Aunt, who is a Tribe member. The Tribe had not yet provided CFS with any feedback and the ICWA expert indicated he would be providing a report to the court.[7]

Mother was released from jail on July 28, 2013. She continued to use drugs and was purportedly pregnant. On July 23, 2013, the child was returned to the home of Aunt and her husband (relative caregivers). The relative caregivers desired to adopt the child and provide him with a permanent home. The child had previously been in his relative caregiver's home for about 18 months when he was initially detained in June 2011. The relative caregivers were committed to caring for the child and adopting him. They had known the child all his life and had developed a strong and loving relationship with the child. The child viewed his relative caregivers as his parental figures and had a strong attachment to them. The child wanted his relative caregivers to adopt him.

On November 12, 2013, ICWA expert Powers submitted his declaration and report. In his declaration, Powers noted his expertise, qualifications, education, tribal affiliation, training, and the background of this case. After reviewing the relevant documents in this case and interviewing the social worker, a Tribe member, and Aunt on

---

[7] CFS had received a letter from the Tribe ICWA social worker on May 1, 2013, stating the child was a quarter degree Navajo Indian blood, and had enclosed a copy of the Certificate of Navajo Indian Blood with the child's roll number.

9

various occasions, Powers concluded that "[a]ctive efforts [had] been made to provide rehabilitative and remedial services to prevent the breakup of this Indian Family" and that returning the child to Mother's care would cause the child to suffer serious physical and emotional harm.

On November 13, 2013, Mother filed a section 388 petition to modify the court order based on her progress in various programs. Mother requested that the child be returned to her care or that reunification services be reinstated and visitation liberalized. CFS filed an opposition, noting the child had become very bonded to his relative caretakers and had adjusted well to the nurturing environment and stability of the home. CFS also noted that Mother had completed programs while incarcerated and programs as required by her probation. However, Mother had not provided any documents addressing her substance abuse and her probation officer believed that Mother was avoiding drug testing.

A section 366.26 hearing and a hearing on Mother's section 388 petition were held on December 9, 2013. Mother was present and the ICWA social worker appeared telephonically. After the ICWA social worker twice indicated that she could not hear what was going on, the court stated: "You know what we're going to do is we're going to disconnect the call, and if you want to appear in this department, you're going to have to drive here. You're interrupting court proceedings at this point." The ICWA social worker replied, "Okay. Thank you." It appears the call was then disconnected.

The juvenile court then heard and denied Mother's section 388 petition.  The court thereafter proceeded to the section 366.26 hearing.  Following Mother's testimony and argument from counsel, the juvenile court found that the child was adoptable and terminated parental rights.[8]  The court also found that CFS had complied "with the noticing requirements" of ICWA and that CFS had "made active efforts to prevent the breakup of this family that has Indian heritage within the meaning of [the] ICWA."

Mother subsequently filed a timely notice of appeal.

II

DISCUSSION

Mother argues that the juvenile court committed reversible error when it failed to order a "tribal customary adoption" report before it terminated her parental rights as required by the ICWA, the Welfare and Institutions Code, and the California Rules of Court.[9]  County counsel responds that Mother forfeited this issue and that an assessment report was not required to address the option of tribal customary adoption (TCA).  In the alternative, county counsel claims any error was harmless.

---

[8]  Counsel for CFS noted that the Tribe "concurred with the Department's recommendation."  After being advised by CFS counsel that ICWA expert Powers had reviewed the section 388 petition and that his position was unchanged, Mother's counsel waived the right to have Powers in court to testify in person.

[9]  All further rule references are to the California Rules of Court.

11

A.    *TCA Procedures*

A "'tribal customary adoption'" is an "adoption by and through the tribal custom, traditions, or law of an Indian child's tribe," which does not require termination of parental rights. (§ 366.24, subd. (a)(1).) TCA "is an alternative to a standard adoption and protects both the Tribe's and the child's interests in maintaining tribal membership by formalizing an adoption by an individual selected by the Tribe without terminating parental rights." (*In re A.M.* (2013) 215 Cal.App.4th 339, 348 (*A.M.*).) TCA has been an alternative placement plan for Indian children in California since July of 2010. (See *In re H.R.* (2012) 208 Cal.App.4th 751, 759 (*H.R.*).) The Legislature provided for TCA's in part because "'termination of parental rights can disrupt the child's ability to be a full member of the tribe or participate fully in tribal life.'" (*H.R.*, *supra*, at p. 761.) In a TCA, the adoptive parents may be ordered to provide the child with opportunities to participate in tribal culture. (See *id*. at p. 757.)

"Section 366.24 sets forth the procedures to institute a TCA. First, the assessment report for the selection and implementation hearing must address the TCA option. (§§ 366.21, subd. (i)(1)(H), 366.24, subd. (b).) If the Tribe decides that TCA is the appropriate alternative, the Tribe or its designee conducts a home study prior to approval of the TCA placement, including a check of the Child Abuse Central Index and state and federal criminal background checks. (§ 366.24, subd. (c)(1), (2), & (3).) This assessment and the TCA order from the Tribe should be completed prior to the selection and implementation hearing and the TCA order should be filed with the court prior to the

12

selection and implementation hearing.  (§§ 366.21, subd. (i)(1)(H), 366.24, subd. (c)(6).)  However, if it is not and the Tribe has identified TCA as the desired permanent placement plan, the juvenile court may continue the selection and implementation hearing for up to 120 days to permit the Tribe to complete the process for TCA and file the TCA order with the juvenile court.  (§ 366.24, subd. (c)(6).)  The juvenile court has discretion to continue the hearing for an additional 60 days to complete the TCA process.  (§ 366.24, subd. (c)(6).)  At the selection and implementation hearing the parties may present evidence to the Tribe on the TCA and the minor's best interest.  (§ 366.24, subd. (c)(7).)  Once the juvenile court affords full faith and credit to the TCA order the child is eligible for TCA placement.  (§ 366.24, subd. (c)(8).)  After the order has been afforded full faith and credit, the TCA parents file an adoption petition.  (§ 366.24, subd. (c)(12).)  Following required reports to the court, a period of supervision and a final decree of adoption, the TCA parents have the same rights as any other adoptive parent and the court terminates jurisdiction over the child.  (§ 366.24, subd. (c)(12), (13) & (14).)"  (*A.M.*, *supra*, 215 Cal.App.4th at p. 348.)

"At the section 366.26 hearing, the juvenile court must find that 'the agency consulted with the child's tribe and the tribe was actively involved in the development of the case plan and plan for permanent placement, including consideration of whether tribal customary adoption is an appropriate permanent plan for the child . . . .'  (Cal. Rules of Court, rule 5.725(d)(8)(C).)  If the court finds that the agency did not consult with the child's tribe, it 'must order the agency to consult with the tribe, unless the court finds that

13

the tribe is unable, unavailable, or unwilling to participate.' (Rule 5.725(d)(8)(D).)" (*In re G.C.* (2013) 216 Cal.App.4th 1391, 1398 (*G.C.*); see § 366.24, subd. (f) [requiring Judicial Council to "adopt rules of court . . . to implement tribal customary adoption as a permanent plan for dependent Indian children"].)

B. *Failure to Comply With Statutory Procedures*

Mother argues that reversal is required because the juvenile court when it set the section 366.26 hearing did not order an assessment of a TCA pursuant to section 366.24. (See §§ 366.21, subd. (i)(1)(H), 366.24, subd. (b).) However, Mother forfeited this argument by failing to assert it in the juvenile court. (*G.C.*, *supra*, 216 Cal.App.4th at pp. 1398-1399 [father forfeited argument that court did not consider appropriateness of TCA as the minor's permanent plan]; see also *In re Urayna L.* (1999) 75 Cal.App.4th 883, 885-886; *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1339.)

But even if the contention had not been forfeited, any failure to address TCA was harmless.

Two published cases have considered similar claims. In *A.M.*, *supra*, 215 Cal.App.4th 339, the tribe contended on appeal that "TCA was not addressed in any of the assessments for the selection and implementation hearing." (*Id*. at p. 350.) At the initial selection and implementation hearing, the trial court had ordered a guardianship and had given the tribe the opportunity to consider TCA. (*Id*. at p. 342.) However, by the time of the second selection and implementation hearing, the tribe had not taken any action to initiate a TCA. (*Id*. at p. 343.)

14

On appeal, the court found that "[b]ecause there was no tribal order for TCA before it, the juvenile court had no choice but to consider the traditional alternatives for permanent plans. [Citation.]" (*A.M.*, *supra*, 215 Cal.App.4th at pp. 349-350.) The court emphasized that "the initial decision whether to pursue TCA must come from the tribe." (*Id.* at p. 350.) The appellate court rejected the tribe's contention that the Department and the juvenile court were responsible for the "failure to achieve a TCA." (*Ibid.*) Although the TCA law was new at the time of the dependency proceedings, "the Tribe was well aware that the alternative existed at the time of the first selection and implementation hearing." (*Ibid.*) Since the record showed that "the TCA option" had been discussed by the parties, including the tribe, "[a]ny error in failing to include TCA in the assessment" was harmless. (*Id.* at p. 351.)

In *G.C.*, *supra*, 216 Cal.App.4th 1391, the father presented similar claims of error as in this case. He complained that "the selection and implementation report did not indicate the Department had consulted with the Tribe about tribal customary adoption and did not address the option of tribal customary adoption. And the juvenile court did not find the Department had consulted with the Tribe about tribal customary adoption, did not order the Department to do so, and did not consider the appropriateness of tribal customary adoption as a permanent plan." (*Id.* at p. 1398.)

The *G.C.* court found the father's claims were forfeited by his failure to object during the juvenile court proceedings, but it also found that any error was harmless. (*G.C.*, *supra*, 216 Cal.App.4th at p. 1399.) In that case, the mother had Native American

15

heritage, but the father did not, and the child had been placed in a "'Designated Indian Home.'" (*Id*. at p. 1395.) By the time of the selection and implementation hearing, the mother intended to relinquish her parental rights. Although the tribe initially did not support termination of parental rights, it informed the juvenile court that in light of the mother's intent to relinquish, it did support adoption and termination. (*Id*. at pp. 1396-1397.)

In explaining why the procedural errors were harmless, the *G.C.* court emphasized that "[t]ribal customary adoption is only an option when the child's tribe identifies it as an option. [Citations.]" (*G.C.*, *supra*, 216 Cal.App.4th at p. 1401.) Although the record did not reflect that the tribe discussed TCA with the social worker, the record did reflect that the tribe was involved in the selection of the appropriate permanent plan for the minor. The court had "no reason to speculate that the Tribe was unaware of tribal customary adoption as an alternative permanent plan." (*Ibid*.) Thus the father failed to show "a reasonable probability that compliance with the procedural requirements of tribal customary adoption would have resulted in an outcome more favorable to him." (*Ibid*.)

In the instant case, CFS's section 366.26 report did not specifically address the option of TCA. Additionally, although CFS did consult with the ICWA expert who made contact with a tribal representative prior to the selection and implementation hearing, it is not clear whether CFS or the ICWA expert ever asked the Tribe to specifically consider the option of TCA. Moreover, even though CFS sent notices and made inquires to the Tribe's social worker, the Tribe never responded and never identified TCA as the

16

permanent placement plan, and CFS did not recommend such a plan to the juvenile court. Section 366.25, subdivision (b)(1)(G), provides that the selection and implementation report must include "an assessment of the likelihood that the child will be adopted, *when, in consultation with the child's tribe, a tribal customary adoption, as defined in Section 366.24, is recommended.*" (Italics added.) Thus, omission of an assessment of the likelihood of TCA was not error under section 366.25, subdivision (b)(1)(G).

In any event, assuming the provisions of section 366.24, subdivision (b), were required, any error was harmless, as in the cases discussed above. Significantly, the Tribe never identified TCA as an option, and this court has "no reason to speculate that the Tribe was unaware of the tribal customary adoption as an alternative permanent plan." (*G.C.*, *supra*, 216 Cal.App.4th at p. 1401; see also *A.M.*, *supra*, 215 Cal.App.4th at pp. 350-351; *H.R.*, *supra*, 208 Cal.App.4th at p. 765 ["tribal customary adoption is an available option only when identified as such by the child's tribe"].) Instead, the Tribe concurred with CFS's recommendation of adoption with termination of parental rights. The ICWA expert also recommended adoption by Aunt and her husband. Presumably the Tribe and the ICWA expert supported the plan of adoption by Aunt because Aunt herself was a member of the Tribe with tribal ties. A TCA would have required adoption by a suitable member of the Tribe, i.e., a suitable member of the child's family, or an unrelated member of the Tribe. Here, a plan of adoption by Aunt met these requirements.

In sum, because the Tribe never identified TCA as an option; the Tribe and the ICWA expert concurred with CFS's recommendation of adoption with termination of

17

parental rights; and the child would be adopted by a relative tribal member, Mother has failed to show "a reasonable probability that compliance with the procedural requirements of tribal customary adoption would have resulted in an outcome more favorable to [her]."  (*G.C.*, *supra*, 216 Cal.App.4th at p. 1401.)

## III

## DISPOSITION

The judgment is affirmed.

CERTIFIED FOR PUBLICATION

RAMIREZ
P. J.

We concur:


McKINSTER
J.


MILLER
J.