Filed 2/5/24  In re J.D. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re J.D., et al., Persons Coming Under the Juvenile Court Law. | |
| SOLANO COUNTY HEALTH AND SOCIAL SERVICES DEPARTMENT,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>A.T., et al.,<br><br>　　　Defendants and Appellants. | A167852<br><br>(Solano County Super. Ct. No. J45190; J45191) |

Defendants and appellants A.T. (Mother) and J.D. (Father) appeal the juvenile court's order terminating their parental rights as to their twin children after a hearing pursuant to Welfare and Institutions Code section 366.26.[1]  Mother contends the court erred in ruling that the parental-benefit exception did not preclude the termination of her parental rights.  Father argues that he was entitled to a continuance to explore tribal customary adoption, that plaintiff and respondent Solano County Health and Social Services Department (Department) did not discuss with the relative

---

[1]    All statutory references are to the Welfare and Institutions Code.

1

caregivers the possibility of a guardianship, and that the court erred in finding the parental-benefit exception inapplicable to him. Each parent joins in the other's arguments. We will affirm.

## I. FACTS AND PROCEDURAL HISTORY

The Department filed its initial petition pursuant to section 300, subdivision (b)(1) to declare then-seven-month-old twins(the subject of this appeal), as well as their half-siblings, dependents of the juvenile court. The petition alleged that the children had been exposed to domestic violence, that both parents had a history of drug use, and that Mother tested positive for methamphetamine at the twins' birth. At the initial hearing, Father was declared the twins' presumed father, and the children remained in their parents' custody.

On April 2, 2021, the juvenile court granted the Department's request for a protective custody warrant for the twins after the parents missed several drug tests, Mother tested positive for amphetamines, THC, and methamphetamines, the Department received a referral concerning continuing drug use and violence in the home, and Mother denied the social worker access to the children. The Department filed an amended dependency petition, and the children were detained.

### A. Jurisdiction/Disposition Hearing and Appeal

After a contested jurisdiction and disposition hearing on June 18, 2021, the juvenile court sustained allegations of substance abuse and domestic violence and found that the twins were subject to section 300, subdivision (b). The twins were placed out of home, and the parents were offered reunification services. The parents' case plan included assessments and treatments for mental health and substance abuse, individual counseling, parenting education, and random drug testing.

Mother appealed the jurisdiction and disposition orders, arguing that the Department failed to comply with the Indian Child Welfare Act, 25 U.S.C. § 1901 (ICWA). The Department stipulated to a reversal and limited remand on that ground. We reversed the juvenile court's ICWA findings and remanded for ICWA compliance (A163016).

B. Sixth Month Status Review

The Department filed a Six-Month Status Review Report on November 29, 2021, recommending that reunification services be terminated. The report indicated that the Department had contacted the Kiowa tribe and learned that the minors were eligible for membership. The social worker helped Father submit membership applications that same day.

The Department's report advised that Father and Mother had separated. Mother lived with a boyfriend; Father lived in a sober living environment, and a worker assisted him with housing.

Mother continued to have substance use issues, was not in a substance abuse treatment program, continued to miss drug tests, and tested positive for methamphetamine. She was terminated from therapy for poor attendance but completed online domestic violence and anger management classes. She was scheduled to visit the twins twice a week for one hour and had not missed any visits. Mother was attentive, loving, and engaged with the twins, but did better when the maternal grandmother attended visits with her.

Father did not comply with his case plan. He had not engaged in counseling, parenting education, or substance abuse treatment. He completed only five of 25 drug tests, and all five were positive for methamphetamine and marijuana. Father visited the twins twice per week

for an hour; he was very loving and his visits went well overall, but he had difficulty keeping an eye on both children.

C.  New Disposition Hearing After ICWA Was Found to Apply

Because of the remand for ICWA compliance, the juvenile court held a new disposition hearing on March 23, 2022.  The Department advised that the twins were now enrolled members of the Kiowa tribe and ICWA applied.  A Qualified Indian Child Welfare Expert submitted a written declaration and testimony.  The court found by clear and convincing evidence that continued parental custody was likely to cause serious emotional or physical damage to the twins, that active efforts were made to prevent the breakup of the Indian family, and that the twins' placement was appropriate.  Pursuant to a stipulation, the court ordered an additional six months of reunification services and set a combined six/12-month review hearing.

D.  Six/12-Month Status Review

The Department filed a status review report in September 2022, recommending termination of reunification services as to both parents.

According to the Department's report, Mother had told the social worker that she moved into a sober living environment, but the social worker confirmed that she had not.  Mother completed 30 days of inpatient treatment from March 8, 2022 to April 6, 2022, but thereafter participated in only 11 of 30 drug tests.  She tested positive for methamphetamine four times, positive for alcohol one time, and positive for THC four times.  She attempted to deceive on her drug test samples twice.  She told the social worker that she was in a detoxification facility for a week, but the social worker confirmed she was there for just two days.  Mother participated only partially in outpatient drug treatment.  She reported that she was engaged in mental health services, but the treatment provider confirmed she was

4

removed from services due to her missed sessions. She did not appear for five of 11 sessions of her domestic violence program but did complete some parenting education.

Father was reportedly homeless, and the housing worker was unable to contact him. He did not comply with the counseling component of his case plan, had not participated in parenting education or substance abuse treatment, and missed all 44 drug tests during the reporting period.

Mother had visits with the twins twice a week for an hour. The visits were positive overall, but they remained supervised due to her inability to maintain sobriety, her failure to follow recommendations for in-patient treatment, and her lack of consistency with Therapeutic Visitation Services (TVS). Mother was referred to TVS to obtain additional coaching during visitation and to practice age-appropriate parenting strategies, but she did not follow through.

Father attended most of his weekly visits, which were still supervised. The children were observed to respond to Father only about 65 percent of the time, indicating an attachment issue. According to the visitation worker, it was evident that Father loves the twins and enjoys spending time with them and his visits were positive for them, but they needed therapy to address the attachment issues. The twins were "very stiff" when they first walked into visits with Father, and they were very irritable and fussy on the nights after his visits.

At the contested review hearing on November 1, 2022, the Department made an offer of proof that arrangements were made for Father to be transported to inpatient substance abuse treatment, which he claimed to be interested in. Although an Uber driver dropped him off at the program, he

did not enter. The parents objected to the recommendation to terminate reunification services and submitted the matter for decision.

The juvenile court terminated reunification services for Mother and Father and set a selection and implementation hearing under section 366.26. The parents were allowed to visit the twins twice per month for four hours per month.[2]

E. Section 366.26 Report

In its February 2023 report for the section 366.26 hearing, the Department recommended a permanent plan of adoption for the twins. The twins had been placed with a maternal great-uncle and great aunt in December 2022, and those relative caregivers wanted to adopt them.

The Kiowa tribal representative reported that the tribe supported adoption by the relative caregivers if the twins did not reunify with their parents. She confirmed the tribe's support for legal adoption with termination of parental rights, rather than a tribal adoption.

The children were assessed as generally adoptable. They were happy toddlers who were growing and thriving in their placement with the relative caregivers. They had no unmet needs. They could count to 16 and sing songs such as the "ABC song." They slept through the night and enjoyed attending daycare three days per week. They had adjusted well to their placement and were extra clingy to the relative caregivers after visits with their parents. They had developed a routine, sought the relative caregivers for comfort, and

---

[2]     The parents' attorneys filed notices of intent to file a writ petition from the order setting the section 366.26 hearing (A166496). (Cal. Rules of Court, rules 8.450 & 8.452.) Their attorneys later filed letters stating they found no arguable issue. (See *Glen C. v. Superior Court* (2000) 78 Cal.App.4th 570.) No petition was filed, and the matter was dismissed.

6

called the caregivers "daddy" or "papa" and "mom" or "mommy." The caregivers were engaging and positive with them.

The former FFA (foster family agency) social worker reported that there was a period when Mother did not attend visits consistently, claiming she overslept or forgot. During visits, Mother and Father were attentive and played with the twins, but the twins did not show any distress or hesitation saying goodbye to them. The twins easily left the visits with the social worker and appeared happy when they saw their relative caregivers.

One of the relative caregivers supervised Mother's visits for January and February 2023. Mother was 55 minutes late to her visit on January 29, 2023. She and the maternal grandmother, who accompanied her, gave the twins their phones and at times did not watch the children; the caregiver had to chase down one of the twins as he ran toward the door.

During the reporting period, Father missed one visit in November 2022. He attended two visits in December 2022, struggling at times to engage both children at once. He visited on January 11, 2023, but never appeared for his visit on January 23, 2023. The Department placed Father on a visitation contract, requiring him to confirm his visits two hours beforehand or they would be canceled; he failed to timely confirm his visit for February 23, 2023, and it was cancelled. As a result, there was no visit in February.

The ICWA expert declaration reported that the tribe agreed to adoption by the relative caregivers as opposed to a tribal customary adoption. The expert agreed that continued parental custody was likely to result in serious emotional or physical damage to the twins, and that active efforts had been made and services offered to prevent the breakup of the Indian family and reunite the family. The expert observed that the children were in an ICWA

preferred relative placement, which was the most appropriate and least restrictive placement that met the twins' needs.

F. Mother's Section 388 Petition

In March 2023, Mother filed a petition under section 388, requesting reinstatement of reunification services. The Department opposed, reporting that since the termination of reunification services on November 1, 2022, Mother had attended only six of 10 visits, she was 45 minutes late to a visit in April and did not focus her full attention on the twins during the visit, she had not enrolled in outpatient treatment, she failed to appear for a scheduled drug test, and she was not returning the social worker's calls.

At a hearing on May 9, 2023, the juvenile court ruled that Mother failed to make a prima facie showing and denied the section 388 petition.

G. Contested Section 366.26 Hearing

The contested section 366.26 hearing was held on May 11, 2023. Mother was present. Father was not. His attorney did not know why he was absent and requested a continuance. The Department objected, noting that the social worker left written notice of the hearing along with Father's gas cards at the Department's office and Father had signed for them. In addition, the social worker had spoken to Father that week and reminded him of the hearing. The court gave Father's counsel time to phone and text him, but Father did not respond. The court denied the continuance, finding that Father had attended the previous hearing and was aware of this one.

Social worker Kate Liouh testified that she had performed approximately 200 adoption assessments over her 15 years in the adoption unit. She observed the twins in their placement, where they had been for five months. They had a very good relationship with their caregivers, seemed very comfortable in the home, and sought out the caregivers for comfort when

upset.  Liouh testified that the twins were adoptable and the relative caregivers wanted to adopt them.

Liouh recounted issues with Mother's visits, as reported by the relative caregiver who supervised them.  Mother had attended only six of 10 visits during the reporting period, and the children had no difficulty transitioning away from her at the end of visits.

Father had also attended only six of 10 visits, and the twins had no difficulty transitioning away from him.  During one visit, Father attempted to give the twins a hug, and one of them tried to get away from him.  During Father's most recent visit on April 20, 2023, he lost his temper multiple times when the children fought over toys and one spilled water.  When one of the twins cried for "mommy," referring to the relative caregiver, Father yelled, "she's not your mommy!"  When Liouh tried to intervene, he raised his voice at her too.

Mother testified that during her reunification period (which ended in May 2023), she missed visits around times she was going into treatment programs, but she claimed that the twins would run to her and call her "Mommy," that she comforted them when they got hurt, that she did activities with them, that they were happy to see her, and that they would cry when visits ended.  Mother believed it would hurt the twins if her parental rights were terminated because she was a mother figure to them and was in their lives since they were born.

On rebuttal, Liouh testified that she did not recall from the file or the FFA social worker that the children screamed or cried at the end of Mother's visits, and based on her own observations in September 2023, the twins left the visits easily.

Liouh opined that the benefits of adoption outweighed the benefits of maintaining the parent-child relationship in this case. She added that the relative caregivers wanted to make the "commitment of adoption," and "if given the choice[,] they wanted to adopt."

The tribal representative who attended the hearing recommended termination of parental rights and adoption by the relative caregivers. The ICWA expert's declaration, which was accepted in lieu of live testimony, concluded that the twins' placement was "exceptionally positive," safe, stable, and secure, and the caregivers gave the twins the love, support, and nurturing they needed. The ICWA expert confirmed that the tribe agreed with the case plan.

Father presented no evidence. His attorney asked the juvenile court to select guardianship as the permanent plan.

Mother's lawyer argued that Mother established a beneficial relationship with the twins and that severance of parental rights would be detrimental to them.

The juvenile court found the twins to be generally adoptable. Although Mother had maintained consistent visitation and had a relationship with the children, the relationship was not substantial. The court explained: "I didn't hear that this relationship was a substantial relationship, that it is a substantial positive emotional attachment such that severing of parental rights would cause substantial harm to them, and that harm would outweigh the stability and the permanency of adoption." The court considered the fact that the twins were very young, that they lived away from Mother's care for nearly a year and a half, that they formed attachments with their caregivers, and that they were finally in a place where they had caregivers willing to provide them with permanency. The court found beyond a reasonable doubt

that continued custody of the twins by the parents was likely to result in serious physical and emotional damage to them, because it would disrupt their stability and the consistency they had in their placement. In addition, the court observed that Mother had not made any changes since termination of reunification services to address the issues that brought her before the court. The court terminated Mother's and Father's parental rights and selected adoption as the permanent plan. Mother and Father filed timely notices of appeal.

## II. <u>DISCUSSION</u>

Under section 366.26, the juvenile court selects from permanent plans including adoption, legal guardianship, long-term foster care, and, where applicable, tribal customary adoption. (§ 366.26, subds. (b)(1)–(b)(7).) Where, as here, the juvenile court finds by clear and convincing evidence that the child is likely to be adopted, the court must terminate parental rights and order the child placed for adoption unless the "court finds a compelling reason for determining that 'termination would be detrimental' based" on one of the statutorily enumerated exceptions. (§ 366.26, subd. (c)(1); *In re Autumn H.* (1994) 27 Cal.App.4th 567, 573–574 (*Autumn H.*).) It is the parent's burden to show that exceptional circumstances should preclude adoption and termination of parental rights. (*Autumn H,* at p. 574; *In re A.S.* (2018) 28 Cal.App.5th 131, 152 [juvenile court presumes that terminating parental rights is in the child's best interests, and the parent has the burden to demonstrate a compelling reason for deciding that termination would be detrimental to the child due to one of six reasons enumerated in the statute].)

Here, Mother and Father argue that the juvenile court should have applied the parental-benefit exception set forth in section 366.26, subdivision (c)(1)(B)(i). We disagree.

A.  Parental-Benefit Exception

The parental-benefit exception applies where "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  The parent must prove three elements:  "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child."  (*In re Caden C.* (2021) 11 Cal.5th 614, 631–632 (*Caden C.*).)  The first two elements are reviewed for substantial evidence.  (*Id.* at p. 640.)  The third element requires the juvenile court to "assess[] what the child's life would be like in an adoptive home without the parent in his life . . . by weighing the harm of losing the [parental] relationship against the benefits of placement in a new, adoptive home," and that finding is reviewed for abuse of discretion.  (*Ibid.*)

1.  Mother Failed to Establish the Exception

The Department concedes that, although Mother had periods when she did not visit the children and only attended 60 percent of available visits between the termination of her reunification services and the section 366.26 hearing, her visitation was reasonably consistent.  However, Mother did not establish the other two elements of the exception.

a.  Beneficial Relationship Element

The second element, whether Mother's relationship was beneficial to the children, required Mother to show that the twins had a "substantial, positive, emotional attachment" to her.  (*Caden C., supra*, 11 Cal.5th at p. 636; *Autumn H., supra*, 27 Cal.App.4th at p. 575.)  The focus is on the child, and the relationship may be evaluated by considering factors such as the child's age, the portion of the child's life spent in the parent's custody, the

12

positive and negative effects of their interactions, and the child's needs. (*Caden C.,* at p. 632; *Autumn H.,* at p. 576.)

Substantial evidence supports the juvenile court's conclusion that there was no substantial attachment between the twins and Mother. The twins were eight months old when they were removed from Mother's care. By the time of the section 366.26 hearing, they were almost three years old and had spent over two years—the vast majority of their lives—outside of her care. Mother had visitation twice per week (until services were terminated), but she had not progressed beyond supervised visits. She failed to follow through with TVS to obtain coaching and age-appropriate parenting strategies. From the termination of services until the section 366.26 hearing, visits were available twice per month, but Mother attended only six of 10 of them. According to Liouh's testimony and the social worker's recorded observations, the twins transitioned easily away from Mother at the end of her visits, and the twins were more irritable and fussier after her visits.

Mother points to her own testimony that the children would run to her and call her "Mommy," that she engaged in activities with them, that she comforted them when they got hurt, that she and the children were affectionate with one another, that they were happy to see her, and that they would hug her and not want to let go when arriving and would cry and scream when visits ended. However, Mother's accounts of her visits were contradicted by Liouh's testimony, Department reports, and other evidence in the case. We defer to the credibility assessments of the juvenile court, and it is not our role to reweigh the evidence. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947; *Autumn H., supra,* 27 Cal.App.4th at p. 576.) Substantial evidence supports the court's conclusion that the relationship was not substantial. (See *In re Brian R.* (1991) 2 Cal.App.4th 904, 924 ["pleasant and cordial"

parent-child visits are not enough by themselves to mandate a permanent plan other than adoption].)

### b. *Detriment Element*

As to the third element, Mother had to show that the twins' relationship with Mother was so important to them that the security and stability of a new home would not outweigh its loss. (*Caden C.*, *supra*, 11 Cal.5th at pp. 633–634.) She fails to demonstrate that the juvenile court abused its discretion in concluding that she failed to do so.

As mentioned, there was ample evidence that the twins had no substantial relationship or bond with Mother. On the other hand, there was ample evidence that an adoptive home would provide the twins with security and stability. The twins were well-adjusted, happy, comfortable, growing, and thriving in their placement with their relative caregivers and prospective adoptive parents. The relative caregivers were positive and engaging with the twins, who had no unmet needs. The twins had developed a routine and sought the caregivers for comfort. The twins called the caregivers "daddy" or "papa" and "mom" or "mommy." Mother conceded that the relative caregivers were taking excellent care of the children, and she believed they would continue their commitment to the children. As the juvenile court further noted, the twins were very young and they had been out of Mother's care for a substantial amount of time. Finally, the tribe agreed with the termination of parental rights and legal adoption.

Mother argues that the juvenile court improperly considered whether she had "resolved the problems resulting in the dependency." She notes that the court stated, in explaining part of its reasons for its ruling: "I considered the fact that since family reunification services ended in November, I didn't see and I didn't hear any changes as they pertain to mom that indicated to

14

me that *the issues that brought her before the Court were actually addressed.* [¶] I do find and I find this beyond a reasonable doubt that continued custody of the child by the parent is likely to result in serious emotional and physical damage to the child and that is because again it would disrupt the stability of these minors, the consistency that they have in their placements, the fact that *I'm not convinced mother's issues that brought her before the Court have been addressed to the point that there are no safety concerns for the minors.*" (Italics added.) She argues that Mother's ongoing problems cannot be considered under *Caden C.*

Mother is incorrect. *Caden C.* stated that a parent's inability to overcome the issues that led to the dependency cannot be used as a "*categorical* bar" to the parental-benefit exception. (*Caden C., supra*, 11 Cal.App.5th at p. 637, italics added.) As *Caden C.* explains, "the parent's struggles with issues such as those that led to dependency are relevant only to the extent they *inform the specific questions before the court: would the child benefit from continuing the relationship and be harmed, on balance, by losing it.*" (*Ibid.*, italics added.) That was the general context in which the juvenile court mentioned Mother's struggles here. In any event, unlike *Caden C.*, the court in this case did not rely solely on the parent's continued struggles with substance abuse and failure to reunify. Here, substantial evidence indicated there simply was not a sufficiently significant *relationship*, the loss of which would outweigh the benefits of adoption, in light of the twins' age, time away from parental care, and the detriment that would arise from a disruption of their current care.[3] Mother fails to demonstrate an abuse of discretion.

---

[3] Mother's reliance on *In re B.D.* (2021) 66 Cal.App.5th 1218, 1228–1229 and *In re Dy.P.* (2022) 76 Cal.App.5th 153, 168 is misplaced. In those cases,

### 2. Father Failed to Establish the Exception

Father claims that he "met his burden to prove all three of [the] elements" of the parental-benefit exception "and the juvenile court relied on improper factors in deciding otherwise." But Father did not invoke the parental-benefit exception in the juvenile court. In any event, he fails to demonstrate the exception would apply to him.

#### a. *Forfeiture*

The failure to raise a statutory exception to adoption and termination of parental rights at the section 366.26 hearing forfeits the issue on appeal. (*In re Daisy D.* (2006) 144 Cal.App.4th 287, 292 [no sua sponte duty to consider sibling relationship exception to adoption, so parent's failure to raise it in the juvenile court precludes her from raising it on appeal from termination of her parental rights]; *In re D.P.* (2023) 92 Cal.App.5th 1282, 1292–1293 [forfeiture applies in dependency proceedings].)

Father did not appear at the section 366.26 hearing, his attorney presented no evidence on his behalf, and his attorney did not raise the parental-benefit exception specifically. Father's argument for the parental-benefit exception, raised for the first time on appeal, is forfeited.

#### b. *The Exception Did Not Apply*

Even if Father had not forfeited the issue, there was more than enough evidence to support the rejection of the parental-benefit exception as to him.

As mentioned, the second element of the exception requires the parent to show that the child has a "significant, positive, emotional attachment" to the parent. (*In re Autumn H., supra,* 27 Cal.App.4th at p. 575.)

---

the record was not clear that the juvenile court had relied on facts other than the failure to overcome the issues that led to the dependency (without linking that failure to the elements of the exception) or other improper factors.

Considerations include the child's age, the portion of the child's life spent in parental custody, the positive or negative effect of the interaction between the parent and the child, and the child's particular needs. (*Caden C., supra,* 11 Cal.5th at p. 632.) Here again, the twins were removed from Father's care at eight months of age, and by the time of the section 366.26 hearing, they were 34 months old and had spent 26 of those months out of Father's care. During visits with Father, as late as the 12-month review, the twins were responding to Father only 65 percent of the time and needed therapy to address their attachment issues. They were stiff at the start of his visits and were fussier and more difficult to comfort on the days Father visited. In the six months before the section 366.26 hearing, Father participated in only six of 10 visits. One of the twins had tried to escape from his attempt to hug them. Finally, the twins easily transitioned from Father's visits back to their caregivers.

As to the third element, ample evidence, which we have already described, supported the conclusion that any detriment to the twins in terminating their relationship with Father was outweighed by the permanency and stability of adoption.

Father argues that the twins looked forward to his visits, he was loving, and his visits were "generally good." However, he ignores the evidence to the contrary, and it is not our role to reweigh the evidence. He fails to demonstrate error.

C. Father's Request to Continue the Section 366.26 Hearing

Father contends "the juvenile court made an error of law when it denied [his] counsel's request to continue the section 366.26 hearing for father's presence, . . . specific to Indian children that allows for a continuance for father to present tribal adoption as the more appropriate plan." He notes that section 352 gives the court discretion to continue a hearing upon a

parent's request and showing of good cause, provided the continuance is not contrary to the minor's interest (such as the minor's need for prompt resolution of custody status). (§ 352, subds. (a)(1), (2).) He also notes a provision in section 366.24, which allows the juvenile court to continue a section 366.26 hearing to allow a tribe to complete the proceedings necessary for a tribal customary adoption. From this, he concludes the court had the power to grant Father a continuance for this purpose. But Father never requested a continuance for that purpose, and there was no basis for him to do so.

### 1. Forfeiture

Father's counsel requested a continuance of the section 366.26 hearing solely on the ground that Father was absent and had not been in contact with his attorney. There was no request to continue the matter so he could pursue tribal customary adoption as the permanent plan. Furthermore, Father was aware of the section 366.26 hearing as of the termination of reunification services on November 1, 2022, but he never asked for an analysis of tribal customary adoption at any of the five court hearings between the six/12-month review and the section 366.26 hearing. Father has therefore forfeited this argument. (*In re D.P., supra,* 92 Cal.App.5th at pp. 1292–1293; *In re I.P.* (2014) 226 Cal.App.4th 1516, 1526 [parent forfeited argument that tribal customary adoption should have been considered by failing to assert it in the juvenile court].)

In his reply brief, Father argues that he did not forfeit the argument because his lawyer sought a continuance of the hearing, and because the issues at stake at the hearing included section 366.24 after the court had found that the children were Indian and that ICWA applied. Not so. The tribe had not pursued tribal adoption, so section 366.24 was not at issue.

18

Father's other arguments pertaining to whether he has standing are immaterial.

### 2. Tribe's Right, Not Father's

Contrary to Father's argument, section 366.24, subdivisions (c)(6) and (c)(7), do not afford a parent the right to request a continuance to explore tribal customary adoption.

Section 366.24, subdivision (c)(6) states: "If the *tribe* identifies tribal customary adoption as the permanent placement plan for the Indian child, the court may continue the selection and implementation hearing governed by Section 366.26 for a period not to exceed 120 days *to permit the tribe* to complete the process for tribal customary adoption and file with the court a tribal customary adoption order evidencing that a tribal customary adoption has been completed." (Italics added.) The statute allows only the tribe, but not a parent, to identify tribal customary adoption as the permanent plan. The tribe did not pursue tribal customary adoption, so section 366.24, subdivision (c)(6), does not apply.

Section 366.24, subdivision (c)(7) allows birth parents, among others, to "present evidence *to the tribe* regarding the tribal customary adoption and the child's best interest." (Italics added.) But that does not change the fact that only the tribe can propose tribal customary adoption as the permanent placement. Here, the tribe did just the opposite: it agreed with the legal adoption by the relative caregivers as proposed by the Department.

Father's reliance on *In re H.R.* (2012) 208 Cal.App.4th 751 is misplaced. There, the court of appeal determined that tribal customary adoption is the preferred permanent plan for an Indian child *if it is recommended by the child's Indian tribe.* (*Id.* at pp. 761–762.) Tribal customary adoption is not

available unless the tribe consents and participates.  (*Id*. at p. 766; see *In re I.P.*, *supra,* 226 Cal.App.4th at pp. 1528–1529.)  That did not occur here.

    D.  <u>Option of Relative Guardianship</u>

Father contends the social worker failed to tell the relative caregivers about the relative guardian exception to adoption.  According to Father, this failure "deprived the juvenile court [of] any meaningful opportunity to ascertain the child's best interests under section 366.26, subdivision (h)(1) and whether [the] relative guardian exception under section 366.26, subdivision (c)(1)(A) applied to preserve parental rights."  Therefore, Father argues, the "court's findings that no exceptions to adoption applied and adoption was the best permanent plan for the children are not supported by substantial evidence."  The argument is meritless.

First, Father failed to raise the argument below.  At the contested 366.26 hearing, Father's counsel asked the juvenile court to select legal guardianship as the permanent plan, but never argued that the court could not terminate parental rights because the Department had failed to speak to the care providers about possible permanency options.  Thus, Father forfeited the argument.  (*In re D.P.*, *supra,* 92 Cal.App.5th at pp. 1292–1293.)

Second, Father's assumption that the Department did not discuss the option of guardianship with the relative caregivers is speculative.  In fact, substantial evidence supports the contrary conclusion:  that the Department did discuss relevant placement options with the caregivers.  Liouh testified that she usually talks to the caregivers about permanency and, in this case, the caregivers did not say they refused to do a guardianship, but that they wanted to adopt "if given the *choice*."  (Italics added.)  This suggests they were aware of at least two choices—adoption and legal guardianship.  Furthermore, Father cites no authority to support his argument that the

Department was required to discuss every permanency option with the relative caregivers.

Third, the relative guardian exception to adoption does not apply here. It applies only where the "*child is living with a relative who is unable or unwilling to adopt the child* because of circumstances that do not include an unwillingness to accept legal or financial responsibility for the child, but who is willing and capable of providing the child with a stable and permanent environment through legal guardianship, and the removal of the child from the custody of their relative would be detrimental to the emotional well-being of the child." (§ 366.26, subd. (c)(1)(A); italics added.) Here, the relative caregivers *were* willing to adopt the twins.

Finally, and regardless of the foregoing, the juvenile court was not deprived of the ability to appropriately assess permanency options. Both parents' attorneys asked the court to enter a guardianship rather than adoption as the permanent plan. The option of a tribal adoption was not possible, because the tribe did not pursue it. Overwhelming evidence supports the conclusion that the court chose the best permanent plan for the twins, consistent with section 366.26.

## III.  DISPOSITION

The order is affirmed.

CHOU, J.

We concur.

JACKSON, P. J.
SIMONS, J.

*In re J.D.* / A167852